1
2
3
4
5
6
7
8                      UNITED STATES DISTRICT COURT

9                      EASTERN DISTRICT OF CALIFORNIA

10

11   SUKHWINDER KAUR, et al.,                    No.  2:14-cv-00828-TLN-AC

12                   Plaintiffs,
                                                 **ORDER**
13            v.

14   CITY OF LODI, et al.,

15                   Defendants.

16

17          This matter is before the Court pursuant to Defendants City of Lodi ("Lodi"), City of Lodi

18   Police Department ("LPD") and Mark Helms's ("Chief Helms") Motion for Summary

19   Adjudication (ECF No. 163) and Defendants Miles Scott Bratton ("Corporal Bratton") and Adam

20   Lockie's ("Officer Lockie") Motion for Summary Judgment, or in the alternative, Summary

21   Adjudication (ECF No. 164).[1]

22          The Court will refer to Lodi, LPD, and Chief Helms as the "City Defendants."  The Court

23   will refer to Corporal Bratton and Officer Lockie as the "Officer Defendants."  For efficiency's

24   sake the Court will analyze the Officer Defendants' motion first.  The Court has carefully

25   considered the arguments raised by the parties.  For the reasons set forth below, the Officer

26   Defendants' motion is GRANTED in part and DENIED in part.  Likewise, the City Defendants'

27

28
     ---
     [1]      Also pending are Plaintiffs' several motions to exclude expert testimony (ECF Nos. 154–159) and motion to
     bifurcate (ECF No. 160).  The instant motions do not turn on their resolution.  They will be disposed of separately.

                                                    1

1    motion is GRANTED in part and DENIED in part.

2    **I.    PRELIMINARY DISCUSSION OF THE OFFICER DEFENDANTS' MOTION**

3         This case arises out of a fatal police shooting.  None of the non-officer witnesses (the

4    "Non-Party Witnesses") observed the entirety of the dynamic encounter between Parminder

5    Singh Shergill ("Parminder") and the Officer Defendants.  The Non-Party Witnesses who

6    witnessed the shooting itself could not see whether there was a knife in Parminder's hands at the

7    time he was shot.  However, their testimony does call into question the key factual assertion

8    which underlies the Officer Defendants' motion: "[t]he [Officer Defendants] did not use deadly

9    force until [Parminder] abruptly turned back and 'charged toward' them with the knife."  (ECF

10   No. 164-1 at 38.)  This factual dispute turns on a jury's credibility determinations and cannot be

11   resolved by the Court on summary judgment.

12        Unfortunately, the Officer Defendants' motion takes for granted that this crucial factual

13   assertion is undisputed to such a degree that it is virtually impossible to intelligently engage their

14   arguments without reciting their version of events.  Consequently, the Court will set out a brief

15   summary of the Officer Defendants' version of events in the "Factual Background" section of this

16   Order followed by the material facts that Plaintiffs assert are in dispute.  The Court will also

17   include a brief summary of the deposition testimony of four Non-Party Witnesses who saw (or

18   heard) the shooting because Plaintiffs inaccurately cite two of them for the proposition that it can

19   be definitively stated Parminder "*never* 'armed himself' with a knife."  (ECF No. 177-1 at 15

20   (emphasis added).)

21        The Court mentions an additional item of note.  Plaintiffs submitted more than 60

22   evidentiary objections to the Officer Defendants' proposed statement of undisputed material facts.

23   (*See* ECF No. 177-1.)  However, Plaintiffs acknowledge the Court need not separately address

24   these evidentiary objections in order to resolve this motion.  They have correctly cited *Burch v.*

25   *Regents of Univ. of Cal.*, 433 F. Supp. 2d 1110, 1123 (E.D. Cal. 2006), for the proposition that

26   "objections to evidence on the ground that it is irrelevant, speculative, and/or argumentative, or

27   that it constitutes an improper legal conclusion are all duplicative of the summary judgment

28   standard itself."  (ECF No. 177 at 16 n.5; ECF No. 177-1 at 1–2.)  The Court agrees and will not

2

1   separately address these objections.  Likewise, the Court found it unnecessary to resolve the

2   Officer Defendants' objections to Plaintiffs' evidence offered in support of their opposition in

3   order to resolve the Officer Defendants' motion.  (ECF No. 187-3.)

4       **II.      FACTUAL BACKGROUND OF OFFICER DEFENDANTS' MOTION**

5               A.      The Officer Defendants' Version of Events

6           The Officer Defendants responded to a 9-1-1 call placed from 23 Elderica Way, Lodi, CA

7   (the "Family Home") on the morning of January 25, 2014.  (ECF No. 164-2 at ¶¶ 1, 4.)  On that

8   call Kuldeep Shergill ("Kuldeep"), Parminder's sister-in-law, reported that Parminder was a

9   "paranoid schizophrenic" who was "off his medication," "going crazy," and "attacking [her]

10  mother-in-law" inside the Family Home.  (ECF No. 164-2 at ¶ 4.)  The substance of this call was

11  relayed to the Officer Defendants prior to their arrival at the Family Home.  (ECF No. 164-2 at ¶¶

12  5–8.)  Officer Lockie knew prior to his arrival that he was responding to a family disturbance

13  involving a mentally ill individual attacking a family member.  (ECF No. 164-2 at ¶ 9.)  Corporal

14  Bratton knew there was an assault at the residence involving a schizophrenic subject.  (ECF No.

15  164-2 at ¶ 10.)  In reality, Parminder had attacked no one, but this information was not relayed to

16  the Officer Defendants.  (ECF No. 164-2 at ¶¶ 18–20.)  Additionally, the Officer Defendants

17  assert that Parminder had been drinking, but they do not assert that they were aware of this during

18  their encounter with him.  (*See* ECF No. 164-2 at ¶ 1.)

19          The Officer Defendants arrived approximately 11 minutes after the 9-1-1 call was placed.

20  (*Compare* ECF No. 164-2 at ¶ 11 *with* ECF No. 164-2 at ¶ 4.)  They were told upon arrival that

21  Parminder had already left the Family Home on foot.  (ECF No. 164-2 at ¶ 14.)  They were also

22  informed that Parminder suffered from post-traumatic stress disorder and was off of his

23  medication.  (ECF No. 164-2 at ¶ 16.)  Sarabjit Shergill ("Sarabjit"), Parminder's brother,

24  reported to the Officer Defendants that Parminder was "having an episode" and could likely be

25  found at a nearby park.  (ECF No. 164-2 at ¶ 21.)  Corporal Bratton was given a description of

26  Parminder, including the clothes he was wearing.  (Bratton Dep., ECF No. 164-4 at 112:6-9.)[2]

27

28  [2]      The parties have supplied excerpts of various depositions in their submissions.  For ease of reference, the
    page numbers used in citations in this Order are the ECF page numbers.

3

Corporal Bratton was also told there were guns in the house, but that they were locked up. (ECF No. 164-2 at ¶ 22.) The Officer Defendants were not informed that Parminder owned a knife. (ECF No. 164-2 at ¶ 23.) Corporal Bratton told Kuldeep, Sarabjit, and Sukhwinder Kaur ("Sukhwinder"), Parminder's mother, that the Officer Defendants would drive around the block to look for Parminder. (ECF No. 164-2 at ¶ 26.) Parminder's family was told to call LPD if Parminder returned home. (ECF No. 164-2 at ¶ 28.) The Officer Defendants left the Family Home in separate vehicles for nearby Peterson Park. (ECF No. 164-2 at ¶ 32.)

Corporal Bratton located Parminder in Peterson Park near the basketball courts and parked his vehicle on Evergreen Drive, which fronts the east side of the park. (*See* ECF No. 164-2 at ¶ 36.) Parminder was observed walking through the middle of a coordinated exercise group in Peterson Park. (ECF No. 164-2 at ¶ 41.) Parminder, who was walking east toward Corporal Bratton and eventually past him, did not respond when Corporal Bratton spoke to him. (ECF No. 164-2 at ¶¶ 40, 42–43.) Parminder walked past Officer Lockie, who was in his patrol vehicle at the intersection of Elderica Way and Evergreen Drive at the border of Peterson Park, while Corporal Bratton trailed behind Parminder, attempting to speak with Parminder and asking Parminder to stop. (ECF No. 164-2 at ¶¶ 45–46, 48.) As Parminder continued walking, he told Corporal Bratton, "Fuck you. I am not talking to you." (ECF No. 164-2 at ¶ 49.) Parminder was walking in the general direction of the Family Home. (ECF No. 164-2 at ¶¶ 49–50.) As he did this, Parminder removed a black knife from his clothing, opened it and held it at his side in his right hand. (ECF No. 164-2 at ¶¶ 49–50.) Corporal Bratton relayed this over the radio along with stating that Parminder was refusing commands. (ECF No. 164-2 at ¶¶ 50–54.) Officer Lockie exited his car upon hearing Corporal Bratton report that Parminder had a knife. (Lockie Dep., ECF No. 164-4 at 78:6–10.) Officer Lockie also observed the knife in Parminder's right hand. (ECF No. 164-2 at ¶ 55.)

At some point after Parminder armed himself with a knife, the Officer Defendants drew their guns. (ECF No. 164-2 at ¶¶ 55, 57, 59.) Parminder continued to walk in the general direction of his home while ignoring the commands of the Officer Defendants, including commands to drop his knife. (ECF No. 164-2 at ¶¶ 57–58, 60–61.) Both of the Officer

Defendants grew concerned that Parminder was a threat to his family. (ECF No. 164-2 at ¶¶ 56, 63.) Ultimately, Corporal Bratton radioed that "[w]e are going back on to Elderica, I need you to call the [9-1-1 caller] back and advise them to barricade the front door" noting that the "subject is armed with a knife" and "very agitated." (ECF No. 164-2 at ¶ 64.) The Officer Defendants indicate that they followed Parminder trailing approximately ten to twenty feet behind him and approximately ten to twelve feet from each other. (ECF No. 164-2 at ¶ 66.) Parminder, while continuing to walk away and ignore commands, screamed "you want to talk to me motherfucker." (ECF No. 164-2 at ¶ 67.) Corporal Bratton ordered Parminder to "stop," "drop the weapon," "put down the weapon," and "stop or I will shoot." (ECF No. 164-2 at ¶ 68.)

Parminder then quickly turned around and faced the Officer Defendants, while screaming with his knife in his right hand near his own head and the blade pointed at Corporal Bratton. (ECF No. 164-2 at ¶¶ 70–71.) Corporal Bratton again ordered Parminder to "stop," "drop the weapon," and "stop or I will shoot." (ECF No. 164-2 at ¶ 72.) Corporal Bratton testified Parminder then charged him giving out a "war cry" and screaming: "Fuck you. I'm going to fucking kill you. Fucking kill me." (ECF No. 164-4 at 135:11–136:16.) Officer Lockie testified that he perceived Parminder to be coming "towards [him]." (ECF No. 164-4 at 96:14–18.) At this point, Corporal Bratton was approximately twelve to fifteen away from Parminder. (ECF No. 164-2 at ¶ 75.) The Officer Defendants were standing in front of 61 Elderica Way with Corporal Bratton in the driveway and Officer Lockie to his left. (ECF No. 164-2 at ¶¶ 75–76.) The Officer Defendants fired multiple shots at Parminder when he charged them with his knife. (ECF No. 164-2 at ¶¶ 80–85.) Officer Lockie estimated "maybe a second or two" elapsed between the time Parminder turned towards them and when they began shooting. (ECF No. 164-2 at ¶ 86.) The Officer Defendants continued to shoot until Parminder fell to his knees and stopped advancing. (ECF No. 164-2 at ¶¶ 87–88.) After Parminder was shot, Officer Lockie slid Parminder's knife away with his boot and radioed "shots fired." (ECF No. 164-2 at ¶¶ 90–91.) Parminder was then handcuffed and emergency personnel were immediately called. (ECF No. 164-2 at ¶ 93.) The Officer Defendants performed first-aid until emergency personnel arrived. (ECF No. 164-2 at ¶¶ 96–97.) A California Department of Justice DNA analysis of the knife revealed that Parminder's

DNA was on the knife, but not the Officer Defendants.  (ECF No. 164-2 at ¶ 108.)

Parminder sustained a total of 14 gunshot wounds.  (ECF No. 164-2 at ¶ 115.)  One minute and forty-three seconds elapsed between the beginning of the Officer Defendants encounter with Parminder and the time Parminder was shot.  (ECF No. 164-2 at ¶ 126.)  The Officer Defendants had left their bean bag shotguns in their vehicles and did not think they had time to deploy the less-than-lethal weapons they had on their utility belts once Parminder abruptly turned towards them.  (ECF No. 164-2 at ¶¶ 78–80.)  The Officer Defendants attended a County Mental Health In-Service Training at the Lodi Police Department the day before the shooting.  (ECF No. 164-2 at ¶ 131.)  This training covered the criteria for a Welfare and Institutions Code § 5150 ("Section 5150") hold.  (ECF No. 164-2 at ¶ 132.)  However, the Officer Defendants were not specifically trained on how to approach, speak to, or interact with violent, armed schizophrenic individuals on that occasion.  (ECF No. 164-2 at ¶ 133.)

### B.  Plaintiffs' Statement of Disputed Facts

On the morning of January 25, 2014, Parminder appeared to be experiencing symptoms of his mental illness.  (ECF No. 177-2 at ¶ 1.)  There is no evidence that Parminder consumed alcohol on January 25, 2014.  (ECF No. 177-1 at ¶ 1.)  At no time during Parminder's encounter with the Officer Defendants did he "arm himself with a knife."  (ECF No. 177-2 at ¶ 3.)  In front of the home located at 61 Elderica Way, Parminder stopped walking and began to turn and face the Officer Defendants.  (ECF No. 177-2 at ¶ 4.)  Before Parminder could complete the turn to face the Officer Defendants, they both began shooting Parminder.  (ECF No. 177-2 at ¶ 4.)  As Parminder was turning to face the Officer Defendants, he said "don't shoot!"  (ECF No. 177-2 at ¶ 5.)  Parminder's hands were either in his pockets or down at his sides at this time.  (ECF No. 177-2 at ¶ 6.)  At no time did Parminder move or advance towards the Officer Defendants.  (ECF No. 177-2 at ¶ 7.)  The Officer Defendants continued shooting Parminder, even as he was falling backwards.  (ECF No. 177-2 at ¶ 8.)  The DNA analysis cited by Officer Defendants states DNA from at least two contributors was found on the knife and does not state that the Officer Defendants' DNA was not present.  (ECF No. 177-1 at ¶ 108.)

///

6

1    C.  <u>Non-Party Witnesses of the Shooting</u>

2                    i.      *Timothy Antolin*

3          In his deposition, Timothy Antolin stated that he is Cassandra Lopez's son and that he was

4    in her home at 61 Elderica Way at the time of the encounter between Parminder and the Officer

5    Defendants.  (*See* ECF No. 177-3 at 83:12–19, 84:15–18.)  Mr. Antolin testified that he was in his

6    upstairs bedroom when he heard what he initially assumed to be an argument between a father

7    and child outside.  (*See* ECF No. 177-3 at 85:23–24; 96:8–12.)  It was after Mr. Antolin heard

8    someone say "put down the weapon" that he began observing the encounter between Parminder

9    and the Officer Defendants through the blinds of his bedroom window.  (ECF No. 177-3 at

10   85:21–86:6.)  Mr. Antolin states that "the man [was] standing . . . and the [officers] had him

11   stopped and he was turned around talking to" the officers, who "had their guns pointed at him."

12   (*See* ECF No. 177-3 at 87:1–6.)  Mr. Antolin indicated that at the time the man was shot by the

13   officers he had not completely turned around to face them.  (*See* ECF No. 177-3 at 87:7–24.)  Mr.

14   Antolin stated that he could not see whether the man had anything in his hands at the time the

15   man was shot.  (ECF No. 88:15–19.)  This was because Mr. Antolin "could not see the lower half

16   of [the man's] body" before he was shot.  (ECF No. 88:15–19.)  However, Mr. Antolin testified

17   that the man had not lunged toward the officers.  (ECF No. 88:20–22.)  Rather, the man "didn't

18   move, he didn't yell at them after a certain point . . . he was just standing there."  (ECF No. 177-3

19   at 88:23–25.)  After the man had fallen to the ground, Mr. Antolin stated the officer "put

20   handcuffs on him" and "started rummaging through his pockets."  (ECF No. 177-3 at 89:19–20.)

21   At some point, Mr. Antolin joined his mother in her bedroom which "has a more clear view."

22   (*See* ECF No. 177-3 at 91:1–13.)  Later, Mr. Antolin went outside and saw a knife near the scene

23   of the shooting.  (ECF No. 177-3 at 95:12–15.)  Although he reiterated that he "couldn't see [the

24   man's] hands," Mr. Antolin stated that he suspects the officers had removed the knife from the

25   man's pockets because "it didn't seem to me that he had anything" in his hands.  (ECF No. 177-3

26   at 96:1–7.)

27   ///

28   ///

7

In her deposition, Ms. Lopez testified that she went to an upstairs window in her home after yelling outside drew her attention to the encounter between Parminder and the Officer Defendants. (ECF No. 177-3 at 67:14–15.) Ms. Lopez observed "two officers with their guns drawn on a man and they kept saying stop, drop your weapon, turn around, stop and drop your weapon." (ECF No. 177-3 at 67:24–68:1.) She described the officers as yelling "loud[ly]" with their guns "pointed" at the man. (ECF No. 177-3 a 72:23–73:3.) Ms. Lopez indicated the man the officers were addressing "kept walking and then after a couple of steps he stopped and he was faced" with his back towards the officers. (ECF No. 177-3 at 68:5–9.) Finally, she saw the man "turn, but he didn't surrender" by which she meant "[h]e didn't put his hands up and then turn around[.]" (ECF No. 177-3 at 68:13–14.) Ms. Lopez also stated that the man turned around "quickly" but that he "didn't go at the [officers]" and "didn't charge them." (ECF No. 177-3 at 69:13–17.) Ms. Lopez testified that the man was shot multiple times after turning around. (ECF No. 177-3 at 69:17–70:2.) Ms. Lopez noted that the man "didn't fall immediately" after being shot. (ECF No. 177-3 at 70:7.) Ms. Lopez noted that from her vantage point she could not see his whole body and in particular "if he's right-handed, [she doesn't] know if there's anything in this hand" because she "can't see this." (ECF No. 177-3 at 69:18–20.) However, Ms. Lopez clarified that she did not see the man raise his right arm. (ECF No. 177-3 at 77:1–6.)

### iii.    *Bob Mendes*

In his deposition, Bob Mendes testified that he lives directly opposite the Family Home. (ECF No. 177-3 at 179:19–21.) He witnessed police officers arrive and depart from the Family Home on the morning of January 25, 2014. (*See, e.g.*, ECF No. 177-3 at 179:22–25; 181:17–23.) Mr. Mendes stated that later while he was in his garage he heard yelling and walked out to his driveway. (ECF No. 177-3 at 182:10–18.) Mendes could not identify the distance between the encounter he observed and where he was standing but indicated that he had an unobstructed view. (ECF No. 177-3 at 185:10–22.) Mr. Mendes identified Parminder by name and stated that "I couldn't tell what Parm was saying, I just know that he was yelling[.]" (ECF No. 177-3 at 183:11–12.) Mr. Mendes describes Parminder as facing south — which Mr. Mendes indicated

meant Parminder was facing him — and moving in Mr. Mendes's direction.  (ECF No. 177-3 at 183:22–184:7.)  Mr. Mendes then indicated Parminder "turned and moved north."  (ECF No. 177-3 at 184:6–7.)  Mr. Mendes noticed at some point the officers' weapons were drawn and pointed at Parminder.  (ECF No. 177-3 at 185:1–7.)  Mr. Mendes testified that immediately before Parminder was shot Parminder was "moving towards them with . . . his right arm up, almost as if he was . . . point or yelling, . . . like if you get in an argument[.]"  (ECF No. 164-5 at 96:11–14.)  However, Mr. Mendes also stated that he could not see anything in Parminder's raised right hand from where he was standing.  (ECF No. 164-5 at 96:16–24.)  He also indicated that by the time Parminder turned around "[t]he yelling on [Parminder's] part was kind of over at that point[.]"  (ECF No. 177-3 at 184:5–10.)

*iv.*     *Alexandra Weise*

The excerpt of Alexandra Weise's deposition does not explicitly provide her precise location, but it is obvious from context that on the morning of the encounter she was sleeping in the house across from 61 Elderica Way.  (ECF No. 177-3 at 103:1–10.)  She woke up after hearing voices outside her window.  (ECF No. 177-3 at 103:12–13.)  She remembered people yelling "stop."  (ECF No. 177-3 at 103:18.)  Then someone said "don't shoot."  (ECF No. 177-3 at 103:18–19.)  Then, "all the gunshots went off."  (ECF No. 177-3 at 103:19.)

**III.     STANDARD OF REVIEW**

Summary judgment is appropriate when the moving party demonstrates no genuine issue as to any material fact exists and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  Under summary judgment practice, the moving party always bears the initial responsibility of informing the district court of the basis of its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file together with affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the pleadings, depositions, answers to interrogatories, and admissions on file."  *Id.* at

9

324 (internal quotations omitted). Indeed, summary judgment should be entered against a party who does not make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 (1986); *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288–89 (1968). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. Fed. R. Civ. P. 56(c). The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.* at 251–52.

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *First Nat'l Bank*, 391 U.S. at 288–89. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" *Matsushita*, 475 U.S. at 587 (quoting Rule 56(e) advisory committee's note on 1963 amendments).

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with any applicable affidavits. Fed. R. Civ. P. 56(c); *SEC v. Seaboard Corp.*, 677 F.2d 1301, 1305–06 (9th Cir. 1982). The evidence of the opposing party is to be believed, and all reasonable inferences that may be drawn from the facts pleaded before the court must be drawn in favor of the opposing party. *Anderson*, 477 U.S. at 255. Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. *Richards v.*

*Nielsen Freight Lines*, 602 F. Supp. 1224, 1244–45 (E.D. Cal. 1985), *aff'd*, 810 F.2d 898 (9th Cir. 1987). Finally, to demonstrate a genuine issue that necessitates a jury trial, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Id.* at 587.

## IV.    ANALYSIS OF OFFICER DEFENDANTS' MOTION

The following eight claims against the Officer Defendants are included in the third amended complaint ("TAC") (ECF No. 88). The First Claim — excessive force in violation of the Fourth Amendment pursuant to 42 U.S.C. § 1983 ("Section 1983") — is brought by Sukhwinder, as successor in interest to Parminder. The Second Claim — intentional or reckless provocation in violation of the Fourth Amendment pursuant to Section 1983 — is brought by Sukhwinder, as successor in interest to Parminder. The Third Claim — deprivation of familial association in violation of the Due Process Clause of the Fourteenth Amendment pursuant to Section 1983 — is brought by Sukhwinder, individually. The Fourth Claim — deprivation of familial association in violation of the First Amendment pursuant to Section 1983 — is brought by Plaintiffs. The Ninth Claim[3] — negligence (survival action) under California law — is brought by Sukhwinder, as successor in interest to Parminder. The Tenth Claim — negligence (wrongful death) under California law — is brought by Sukhwinder, individually. The Eleventh Claim — negligent infliction of emotional distress under California law — is brought by Sukhwinder, as successor in interest to Parminder. The Twelfth Claim — interference with civil rights under California law — is brought by Sukhwinder, as successor in interest to Parminder.

The Officer Defendants move for summary judgment on each claim. (ECF No. 164.) The Officer Defendants argue that they are entitled to qualified immunity on each of Plaintiffs' Section 1983 claims. (ECF No. 164-1 at 20.) For this reason, the Court will briefly describe the Section 1983 and qualified immunity standards generally before addressing each of the Section 1983 claims separately. The state law claims will be discussed together, as this is how they are treated in the Officer Defendants' motion.

---

[3]    Certain claims pertain only to the City Defendants. The Court identifies claims as designated in TAC.

A. <u>Section 1983 and Qualified Immunity</u>

Section 1983 provides that "[e]very person who, under color of any [state law] subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured[.]" 42 U.S.C. § 1983. "Section 1983 does not create any substantive rights, but is instead a vehicle by which plaintiffs can bring federal constitutional and statutory challenges to actions by state and local officials." *Anderson v. Warner*, 451 F.3d 1063, 1067 (9th Cir. 2006).

However, "[a]n official sued under § 1983 is entitled to qualified immunity unless it is shown that the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2023 (2014). While "[q]ualified immunity shields federal and state officials from money damages[,]" *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011), it is "an immunity from suit rather than a mere defense to liability[,]" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Consequently, it "is effectively lost if a case is erroneously permitted to go to trial." *Pearson*, 555 U.S. at 231.

A district court evaluating whether a government official is entitled to qualified immunity at the summary judgment stage asks two questions: (1) whether, taking the facts in the light most favorable to the nonmoving party, the officers' conduct violated a federal statutory or constitutional right, and (2) whether the right was clearly established at the time of the alleged misconduct. *See Saucier v. Katz*, 533 U.S. 194, 200–01 (2001). Either question may be addressed first, and if the answer to either is "no," then the officers cannot be held liable for damages. *See Pearson*, 555 U.S. at 236.

With respect to the second prong, "[b]ecause the focus is on whether the officer had fair notice that her conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004). For this reason, the Supreme Court has emphasized the importance of ensuring the evidence is reviewed through the appropriate lens when deciding the "clearly established prong" on summary judgment. *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014).

///

## B.    First Claim: Excessive Force

The Officer Defendants argue that summary judgment should be granted on Plaintiffs' claim for excessive force in violation of the Fourth Amendment because their use of deadly force on Parminder was objectively reasonable taking their view of the facts, which they contend are undisputed.  (ECF No. 164-1 at 20–30.)  Additionally, even if the Court concludes that their use of force violates the Fourth Amendment on those facts, the Officer Defendants argue that they are entitled to qualified immunity because it was not clearly established that their use of deadly force was unconstitutional at the time of the shooting.  (ECF No. 164-1 at 20, 30–34.)

Plaintiffs argue that it is improper to grant summary judgment on this claim because a jury must resolve the disputed material facts surrounding the use of deadly force, e.g., whether Parminder was armed at all, let alone whether he was threatening the Officer Defendants with a knife.  (ECF No. 177 at 17–26.)  Plaintiffs further argue that viewing the record in the light most favorable to them a reasonable jury could conclude that the Officer Defendants use of deadly force violated the Fourth Amendment and did so in a way that violated clearly established law. (ECF No. 177 at 38–42.)

### i.    *Fourth Amendment Standard*

Allegations of excessive force are examined under the Fourth Amendment's prohibition on unreasonable seizures.  *Graham v. Connor*, 490 U.S. 386, 388 (1989).  When evaluating a Fourth Amendment claim of excessive force, a court must ask "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them[.]"  *Id*. at 397.  "[T]here are no per se rules in the Fourth Amendment excessive force context; rather, courts must still slosh [their] way through the factbound morass of reasonableness."  *Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir. 2011) (en banc) (internal quotation marks omitted).  This inquiry "requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake."  *Graham*, 490 U.S. at 396 (quoting *Tennessee v. Garner*, 471 U.S. 1, 8 (1985)); *Scott v. Harris*, 550 U.S. 372, 383 (2007).  "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments — in circumstances that are tense,

13

uncertain, and rapidly evolving — about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–97. "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id*. at 396.

The Ninth Circuit has articulated a three-step approach to the *Graham* balancing test. *See Glenn v. Washington Cty.*, 673 F.3d 864, 871 (9th Cir. 2011). First, the district court "must assess the severity of the intrusion on the individual's Fourth Amendment rights by evaluating the type and amount of force inflicted." *Id*. (internal quotation marks omitted). Second, the district court must "evaluate the government's interest in the use of force." *Id*. Finally, the district court must "balance the gravity of the intrusion on the individual against the government's need for that intrusion." *Id*. (internal quotation marks omitted).

"Because [the excessive force inquiry] nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, [the Ninth Circuit has] held on many occasions that summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly." *Smith v. City of Hemet*, 394 F.3d 689, 701 (9th Cir. 2005) (en banc).

### ii. The Severity of the Intrusion

With respect to the first step, the severity of the intrusion, there is no dispute that the Officer Defendants used deadly force which resulted in Parminder's death. (ECF No. 164-1 at 21.) "The intrusiveness of a seizure by means of deadly force is unmatched." *Garner*, 471 U.S. at 9. Therefore, the Court proceeds to the second and third steps of the Ninth Circuit framework.

### iii. The Government's Interest in the Use of Force

With respect to the second step, the "strength of the government's interest in the force used is evaluated by examining three primary factors: (1) 'whether the suspect poses an immediate threat to the safety of the officers or others,' (2) 'the severity of the crime at issue,' and (3) 'whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Glenn*, 673 F.3d at 872 (quoting *Graham*, 490 U.S. at 396). The "'most important' [of these factors] is whether the suspect posed an 'immediate threat to the safety of the officers or others.'" *Mattos*,

14

661 F.3d at 441 (quoting *Smith*, 394 F.3d at 702). "An officer's use of deadly force is reasonable only if 'the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others.'" *Scott v. Henrich*, 39 F.3d 912, 914 (9th Cir. 1994) (emphasis removed) (quoting *Garner*, 471 U.S. at 3).

The three primary factors for evaluating the second step of the *Graham* test, however, are not exclusive. *See Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010) (describing these as the "core factors"). The Ninth Circuit has made clear that the district court must "examine the totality of the circumstances and consider 'whatever specific factors may be appropriate in a particular case, whether or not listed in *Graham*.'" *Glenn*, 673 F.3d at 872. Other relevant factors may include the availability of less intrusive force, whether proper warnings were given, and whether it should have been apparent to the officers that the subject of the force used was mentally or emotionally disturbed. *See, e.g.*, *id.* at 872; *Bryan*, 630 F.3d at 831; *Deorle v. Rutherford*, 272 F.3d 1272, 1282–83 (9th Cir. 2001). With respect to the possibility of less intrusive force, officers need not employ the least intrusive means available so long as they act within a range of reasonable conduct. *Scott*, 39 F.3d at 915.

The Court will first examine the core *Graham* factors. The Court will then consider those additional factors raised in the Officer Defendants' motion.

### a. Immediate Threat to the Safety of the Officers or Others

Contrary to the Officer Defendants' assertions, whether Parminder was charging them, brandishing a knife, and threatening to kill them when they shot him to death is a disputed question of material fact that must be resolved by a jury. As discussed below, the deposition testimony of the Non-Party Witnesses calls into question the Officer Defendants' accounts of these key moments. The Officer Defendants' suggestion that "witnesses corroborate the [Officer Defendants'] version of events" is misleading. (ECF No. 164-1 at 23.) No more successful is the Officer Defendants' argument that these crucial factual questions should be taken from a jury because one of their experts "opines that all of the physical evidence is consistent with the [Officer Defendants'] version of events" or because Parminder's DNA was on a knife found at the scene of the shooting. (ECF No. 164-1 at 23–24.) Once these disputed facts are properly

15

resolved in Plaintiffs' favor, as they must be on summary judgment, it cannot be said that Parminder was an immediate threat to the safety of the Officer Defendants or others at the time he was shot.

The deposition testimony of four Non-Party Witnesses — Timothy Antolin, Cassandra Lopez, Robert Mendes, and Alexandra Weise — conflicts with the Officer Defendants' accounts in three ways. First, the deposition testimony of Timothy Antolin and Cassandra Lopez squarely conflicts with the Officer Defendants' assertion that Parminder was charging them when they shot him. Ms. Lopez specifically states that after Parminder turned around he "didn't go at the [officers]" and "didn't charge them." (ECF No. 177-3 at 69:13–15.) Mr. Antolin testified that Parminder had not lunged toward the officers. (ECF No. 177-3 at 88:20–22.) Rather, Parminder "didn't move, . . . he was just standing there." (ECF No. 177-3 at 88:23–25.)

Second, the testimony of Mr. Antolin and Ms. Lopez contradicts the Officer Defendants assertion that Parminder "turned and faced [the Officer Defendants] from less than fifteen (15) feet with the knife raised near his head." (ECF No. 164-1 at 22.) Both Antolin and Lopez heard the Officer Defendant make references to a weapon. And neither Antolin nor Lopez could definitively state that there was no knife in Parminder's right hand from their vantage point. (ECF No. 177-3 at 69:18–20; ECF No. 177-3 at 88:15–19.) However, their testimony suggests that Parminder's right hand was not raised as he turned. (ECF No. 177-3 at 68:23–69:6; ECF No. 177-3 at 88:15–19.) In fact, Mr. Antolin states the reason he could not tell whether anything was in Parminder's hands because he "could not see the lower half of [Parminder's] body" from his vantage point. (ECF No. 177-3 at 88:15–19.) Mr. Antolin testified that it appeared that Parminder's may have "had his hands in his pockets[.]" (ECF No. 177-3 at 88:15–19.)

Third, the testimony of Mr. Antolin, Mr. Mendes and Ms. Weise calls into question whether Parminder was yelling and letting out a "war cry" while charging the Officer Defendants. (*See* ECF No. 164-1 at 22.) Mr. Antolin testified Parminder had stopped yelling prior to beginning to turn around. (ECF No. 177-3 at 88:20–25.) Mr. Mendes indicated that by the time Parminder turned around "[t]he yelling on [Parminder's] part was kind of over at that point[.]" (ECF No. 177-3 at 184:5–16.) Ms. Weise testified she heard someone say "don't shoot" just

before the shots were fired.  (ECF No. 177-3 at 103:18–19.)

As is apparent from the Officer Defendants' discussion in their brief, Mr. Mendes testimony differs from Mr. Antolin and Ms. Lopez's testimony and is in some ways consistent with the Officer Defendants' testimony.  (*See* ECF No. 164-1 at 23.)  However, this misses the point.  The question at the summary judgment stage is not whether Mr. Mendes's testimony is as supportive of the Officer Defendants' version of events as they suggest.  It is similarly not the question whether the Non-Party Witnesses' accounts are entirely consistent with each other.  The question is whether the Officer Defendants' version of events is rendered genuinely in dispute by the evidence properly before this Court.  It is.

The Officer Defendants' suggestion that their account is corroborated by the California Department of Justice's finding of Parminder's DNA on a knife recovered from the scene does not change this.  (ECF No. 164-1 at 24.)  Although this may be consistent with their accounts, it is not inconsistent with the account of the eyewitnesses.  As previously noted Mr. Antolin believed Parminder's hands may have been in his pockets.  He then testified that after Parminder fell to the ground, an officer "put handcuffs on him" and he "started rummaging through his pockets."  (ECF No. 177-3 at 89:19–20.)  It was only after this that Mr. Antolin saw a knife near the scene of the shooting.  (ECF No. 177-3 at 95:9–15.)  A jury could find that Parminder owned a knife which had his DNA on it, but that it had been in his pocket at the time of the shooting.  Therefore, they could conclude that he did not present an immediate threat to officers or anyone else.

Similarly, the opinion of Alexander Jason, the Officer Defendants' "bullet wound expert," that the physical evidence is "consistent" with the Officer Defendants' accounts does not render their version of events undisputed.  (ECF No 164-1 at 23.)  The Court will briefly demonstrate this for Findings 2 through 5 contained in Mr. Jason's Declaration.[4]  (Jason Decl., ECF No. 164-9 at ¶¶ 17–20.)

Finding 2 is that the "wound paths of the decedent are consistent with him moving forward toward Officer Bratton while being struck by the bullets."  (ECF No. 164-9 at ¶ 17.)

---

[4] Finding 1 deals with the geographical location of the shooting.  (ECF No. 164-9 at ¶ 16.)

Jason makes no effort to explain why the wound paths are inconsistent with the accounts of the Non-Party Witnesses. Moreover, he does not purport to know the order the 14 bullets entered into Parminder. Rather, he supports his finding by first repeating it essentially verbatim and then noting the following: (i) "[T]he wound paths . . . are also consistent with … rotational movement by the decedent and . . . bending forward movements as the shots were being fired." (ECF No. 164-9 at ¶ 17.) (ii) Six of the shots had "downward trajectories" consistent with "leaning forward." (ECF No. 164-9 at ¶ 17.) And (iii) one of those six shots struck Parminder's jaw and continued into his chest, which Jason states is consistent with "leaning forward in an aggressive manner" seemingly because Parminder having his chin "near his chest" is not consistent with standing erect. (ECF No. 164-9 at ¶ 17.)

Jason gives no explanation why having "rotational movement" suggests forward motion. Jason does not state whether this rotation came before Parminder's supposed charge — which would be consistent with statements of Antolin and Lopez that Parminder was shot as he was turning or having just completed his turn toward the Officer Defendants — or after the shooting commenced — which may simply have been an effort to turn away as Parminder was being shot multiple times. Likewise, Jason does not indicate why leaning forward is inherently aggressive. It is noteworthy that Jason's own analysis suggests that five of the eleven shots that struck Parminder as he faced the Officer Defendants *did not have a downward trajectory* — one shot to the abdomen, two to the chest, and two in the legs. (*See* ECF No. 164-9 at ¶ 17.) If any or all of those five shots struck first, there are plausible alternative explanations for why Parminder was leaning forward that Jason does not discuss, let alone rule out. Might Parminder have been doubled over in pain when he was hit with the downward trajectory bullets? Did Parminder reflexively lean forward to look down to see where he had been hit? Was this some futile, instinctive attempt to make himself a smaller target? Tucking his chin to his chest seems just as plausibly explained by any of these.

Finding 3 is that one of the three gunshot wounds not previously discussed entered Parminder's arm in a manner consistent with Parminder's right hand being in an "outstretched position toward the shooter[.]" (ECF No. 164-9 at ¶ 18.) Finding 4 is that the path of another of

these three gunshot wounds suggests that Parminder was "shot with right upper arm raised to his shoulder level[,]" which Jason opines is consistent with holding a knife up in "stabbing motion." (ECF No. 164-9 at ¶ 19.)  Finding 5 is that "bullet defects on decedent's clothing are consistent with the right arm being raised when at least one of the bullets struck."  (ECF No. 164-9 at ¶ 19.) Again, there are plausible alternative explanations as to why Parminder might have his right arm raised with an outstretched hand to shoulder height that are inconsistent with the Officer Defendants' account, which Jason makes no effort to rule out.  Parminder might have been gesturing at the Officer Defendants to back off or leave him alone — which would be consistent with Mr. Mendes's testimony.  (*See* ECF No. 164-5 at 96:11–14.)  He might have been raising his hands to surrender or in effort to signal to the Officer Defendants not to shoot (or not to continue shooting) — which would be consistent with Ms. Weise hearing someone say "don't shoot."  (*See* ECF No. 177-3 at 103:18–19.)  Quite simply, these factual questions are not appropriately resolved by the Court on summary judgment.  Therefore, this factor does not support granting the Officer Defendants' motion.

b.   Severity of the Crime at Issue

Viewing the summary judgment record through the proper lens, by the time the Officer Defendants encountered Parminder, they had reason to believe Parminder committed a misdemeanor act of domestic violence rather than a felony.  "While 'the commission of a misdemeanor offense is not to be taken lightly, it militates against finding the force used to effect an arrest reasonable where the suspect was also nonviolent and posed no threat to the safety of the officers or others.'"  *Newman v. San Joaquin Delta Cmty. Coll. Dist.*, 814 F. Supp. 2d 967, 975 (E.D. Cal. 2011) (quoting *Bryan*, 630 F.3d at 828–29).

As this Court recently explained, under California law, the distinction between felony and misdemeanor domestic violence is whether the victim has suffered a physical injury.  *See Reed v. City of Modesto*, 122 F. Supp. 3d 967, 975 (E.D. Cal. 2015).  The Court is mindful that the Officer Defendants were not told that the reported attack on Parminder's mother had not occurred and that reasonableness is "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  *Graham*, 590 U.S. at 396.  However, like *Reed*,

19

there is no evidence in the record that the Officer Defendants observed any injury on any of the persons in the home. To the contrary, the Officer Defendants admittedly left the Family Home without ascertaining whether anyone there had been injured. (ECF No. 177-3 at 19:3–9 (Corporal Bratton testifying that he left without learning whether anyone had been hurt); ECF No. 177-3 at 146:19–25 (Officer Lockie testifying that he had not asked whether anyone was hurt and did not hear Corporal Bratton ask this question).)

That this misdemeanor involved domestic violence does not support a conclusion that the Officer Defendants' use of force was reasonable because at the time they encountered Parminder the reported domestic dispute was not ongoing and the alleged victim was not in immediate danger. While the Ninth Circuit has emphasized the increased danger officers face when responding to domestic disturbances, Ninth Circuit precedent has distinguished cases where (i) the domestic dispute terminated before officers arrived and (ii) the alleged abuser is no longer in the presence of or close proximity to the victim. This precedent can be succinctly summarized as follows:

> Domestic violence situations are "particularly dangerous" because "more officers are killed or injured on domestic violence calls than on any other type of call." *Mattos*, 662 F.3d at 450. At the same time, we explained in *Mattos* that the legitimate escalation of an officer's "concern[ ] about his or her safety" is less salient "when the domestic dispute is seemingly over by the time the officers begin their investigation." *Id.* Years before that we had held — in another en banc decision — that a husband's criminal abuse of his spouse "provide[d] little, if any, basis for the officers' use of physical force" because when law enforcement "arrived [the husband] was standing on his porch alone and separated from his wife." *Smith*, 394 F.3d at 703.

*George v. Morris*, 736 F.3d 829, 839 (9th Cir. 2013). This is such a case. Indeed, in the instant case Parminder was further removed from the Family Home than the husbands in *Smith* and *George*. *See id.* at 832–33, 839 (husband shot while on his back patio); *Smith*, 394 F.3d at 693–94, 702–03 (husband tackled, pepper sprayed, and attacked by police dog on his front porch).

The Officer Defendants' characterization of the crime at issue in their briefing results from a refusal to review the record through the prism of the traditional summary judgment

20

standard.  The Officer Defendants suggest that the crimes at issue were "[a]ssault with a deadly weapon or by force likely to produce great bodily injury[.]"  (ECF No. 164-1 at 25.)  Certainly, for the reasons stated above, this is not a characterization of the falsely reported domestic disturbance that the Court can accept at the summary judgment stage.  However, the Officer Defendants' brief suggests that this relates to Parminder's activities with a knife after Parminder left his home.  (*See* ECF No. 164-1 at 24–25.)  Again, this presupposes the very much disputed facts that Parminder was armed with a knife and attacked the Officer Defendants, and so it too must be rejected.

For the foregoing reasons, this factor does not support granting the Officer Defendants' motion.

### c.  Resisting Arrest or Attempting to Evade Arrest by Flight

At the time of the shooting, viewing the evidence in the light most favorable to Plaintiffs, a jury could conclude Parminder was neither resisting nor attempting to flee, for the reasons set forth above.  Parminder was asked to stop.  A jury could conclude that he did.  Two witnesses indicated Parminder did not move toward the Officer Defendants at that point and turned (or was in the process of turning) to face them.  An earwitness testified she heard a person say "don't shoot."

### d.  Additional Factors to Consider

The Officer Defendants offer arguments with respect to five additional factors.  The Court notes that four of these five arguments are little more than identifying factors that the Ninth Circuit has recognized as being appropriately considered in some cases coupled with a reformulation of their assertion that it is undisputed that they shot a man who was attacking them with a knife.  The Ninth Circuit has unambiguously stated that "where a suspect threatens an officer with a weapon such as a gun or a knife, the officer is justified in using deadly force." *Smith*, 394 F.3d. at 704.  However, the Ninth Circuit has repeatedly noted that a "simple statement by an officer that he fears for his safety or the safety of others is not enough." *See, e.g.*, *Mattos*, 661 F.3d at 441–42.  This is not changed by repeating it over and over again under the guise of requesting the Court to consider "additional" factors under *Graham*.

Arguments of this sort are not helpful and do not warrant detailed responses on their own terms, i.e., discretely analyzing "additional" *Graham* factors only after improperly resolving crucial factual disputes in favor of the moving party. This is particularly true where it essentially assumes what the Ninth Circuit, sitting en banc, has twice described as the "most important" consideration under *Graham* —— whether the suspect posed an "immediate threat to the safety of the officers or others." *Mattos*, 661 F.3d at 441; *Smith*, 394 F.3d at 702. *Graham* itself admonished that the overarching inquiry —— whether the force used to effectuate a particular seizure was reasonable —— "is not capable of precise definition or *mechanical application*." *Graham*, 490 U.S. at 396 (emphasis added). The enumerated factors are meant to facilitate (and focus) the inquiry into whether the amount of force applied was reasonable in the totality of the circumstances the officers found themselves when they applied the force. *Smith*, 394 F.3d at 701. This is precisely why a district court's inquiry at the summary judgment stage is not limited to the three factors enumerated in *Graham*. *Mattos*, 661 F.3d at 441; *Smith*, 394 F.3d at 701.

As to the Officer Defendants' argument that the fast development of events supported their use of deadly force, this must be rejected. (*See* ECF No 164-1 at 27–28.) A jury could find that at the time the Officer Defendants shot Parminder, he had come to a stop, faced them, did not brandish a weapon, and said "don't shoot." In other words, the situation was no longer dynamic and the Officer Defendants were not faced with imminent danger. It is well settled that the desire to end an encounter with a suspect quickly does not render the application of deadly force reasonable. *See Glenn*, 673 F.3d at 876–77. Moreover, as a jury could find Parminder did not pose an immediate threat, acting quickly is not a license to act unreasonably or excessively. *See Mattos*, 661 F.3d at 451.

Similarly, the Officer Defendants' argument that time did not allow them to appropriately consider less lethal force must be rejected. (*See* ECF No. 164-1 at 27.) As already discussed, a jury could find Parminder had come to a stop at the Officer Defendants' request and said "don't shoot" at the time he was shot. This would permit the Officer Defendants to weigh alternatives short of shooting Parminder repeatedly at close range. Less intrusive means are not limited to applications of lesser amounts of force as the Officer Defendants' arguments seem to suggest.

*See Deorle*, 272 F.3d at 1282 ("[The officer who fired a less than lethal shotgun at plaintiff] could have easily avoided a confrontation, and awaited the arrival of the negotiating team . . . ."); *Glenn*, 673 F.3d at 874 ("[Decedent] stood in the driveway several feet from the officers (who could have moved farther away at any time, had they wanted to), with guns trained on him, while his friends stood behind the officers and his parents and grandmother were in their homes."). Quite simply, a reasonably jury need not accept the Officer Defendants' argument that they were presented a binary choice: either allow themselves to be killed or "draw[] their weapons[,] shout[] commands," and then shoot Parminder to death. *See id*. at 876 ("[W]hen dealing with an emotionally disturbed individual who is creating a disturbance or resisting arrest, as opposed to a dangerous criminal, officers typically use less forceful tactics.").

The Officer Defendants argue that giving Parminder warnings supports granting their motion. (ECF No. 164-1 at 26.) This also fails. Ninth Circuit precedent does provide that "*[a]ppropriate warnings* . . . should be given, when feasible, if the use of force may result in serious injury." *Glenn*, 673 F.3d at 864 (emphasis added). Suppose the Officer Defendants told Parminder: "We have reason to believe you have committed a misdemeanor and may be suffering from mental illness. If you do not cooperate with us within 103 seconds, we are prepared to shoot you fatally, even if you are unarmed, standing still, silently facing us, and ask us not to." It is doubtful that the Officer Defendants would directly defend such a warning as proper if those were indeed the circumstances in which it was given, i.e. whether the warning was "appropriate." But in essence those are the circumstances which a jury could conclude the Officer Defendants found themselves.

The Officer Defendants' argument with respect to Parminder's mental illness also fails. In short, they suggest "cases [that] have criticized the use of force against mentally ill persons" are distinguishable because Parminder was shot to death while attempting to stab the Officer Defendants to death. (ECF No. 164-1 at 28–29.) This does not warrant a response as it clearly ignores the summary judgment standard. Moreover, a jury need not accept the Officer Defendants statement that they "perceive[d]" themselves to be dealing with a dangerous criminal suspect rather than a mentally ill person. (ECF No. 164-1 at 29.) Both of the Officer Defendants

23

acknowledge that they were aware prior to their arrival at the Family Home that they were responding to an incident involving a reportedly mentally ill person. (*See* ECF No. 164-2 at ¶¶ 9–10.) A reasonable jury could find that it should have been apparent to the Officer Defendants that Parminder was mentally ill and that he had not committed a severe crime. In that circumstance, Ninth Circuit precedent is clear that the government interest in the use of force is diminished. *See Glenn*, 673 F.3d at 876; *Bryan*, 630 F.3d at 829. The government interest in that context is in providing treatment and ensuring the potentially mentally ill person does not present a danger to himself or others rather than punishing him. *See Bryan*, 630 F.3d at 829. It should be kept in mind that officers who are investigating whether detention under Section 5150 is appropriate are not investigating a crime. *Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1057 (9th Cir. 2003).

Lastly, the Officer Defendants argue that their use of force was made more reasonable because of Parminder's family's "relative culpability" in "creat[ing this] dangerous situation." (ECF No. 164-1 at 26–27.) The Officer Defendants' rely on *Espinoza v. City and Cty. of San Francisco*, 598 F.3d 528, 537 (9th Cir. 2010), for this proposition. This reliance is misplaced. That quotation does describe the "parties['] 'relative culpability,'" but this simply paraphrases the following quote from *Scott*:

> "So how does a court go about weighing the perhaps lesser probability of injuring or killing numerous bystanders against the perhaps larger probability of injuring or killing a single person? We think it appropriate in this process to take into account not only the number of lives at risk, but also their relative culpability."

*Scott*, 550 U.S. at 384. Nothing suggests that "parties" as used in *Espinoza* means litigants. As the Ninth Circuit, sitting en banc, explained this statement from *Scott* merely observes that "in weighing the *Graham* governmental interests in a situation where someone is likely to get hurt — either a fleeing suspect or innocent bystanders — it is 'appropriate in this process to take into account . . . relative culpability.'" *Mattos*, 661 F.3d at 450. Plaintiffs do not dispute that Kuldeep falsely reported that Ms. Kaur was attacked by Parminder. (ECF No. 177-1 at ¶¶ 18–19.) It seems quite apparent from Kuldeep's deposition she hoped to provoke a quicker response time by making the police believe they were responding to a violent domestic dispute.

24

(ECF No. 164-4 at 11:4–25.) However, if Parminder had survived his wounds and, therefore Plaintiffs were not "parties" with respect to this claim, there could be no argument that the Officer Defendants' behavior would become less reasonable. The Court's analysis has already factored in that the Officer Defendants believed they had responded to a domestic dispute and that they were not told this was untrue until after they shot Parminder.

For the foregoing reasons, none of the foregoing factors support granting the Officer Defendants' motion.

> ### iv. Balancing the gravity of the intrusion against government's interest

The foregoing analysis makes evident that the question whether the force used here was reasonable is a matter that cannot be resolved in favor of the Officer Defendants on summary judgment. The Officer Defendants have failed to meet their burden to show that there are no questions of material fact regarding whether the use of deadly force was reasonable. Plaintiffs have proffered evidence from which a reasonable jury could find that the Officer Defendants (i) had reason to believe they were dealing with a mentally ill individual, (ii) who at most committed a misdemeanor, (iii) was not fleeing, (iv) had not armed himself with a knife, (v) was not threatening the Officer Defendants or anyone else, (vi) whose non-compliance, if any, at the time he was shot consisted of passively standing facing them, and (vii) may have said "don't shoot." A jury could further find that, even assuming Parminder was warned, such warnings were inadequate or inappropriate in the circumstances in which they were given. Consequently, the governmental interest in using force would be minimal and substantially outweighed by the severity of the intrusion on Parminder's rights, and therefore a reasonable jury could conclude the Officer Defendants' violated the Fourth Amendment.

Unless the Court concludes that the Officer Defendants are entitled to qualified immunity, the Officer Defendants' motion must be denied with respect to this claim.

### C. Qualified Immunity

Viewing the evidence in the light most favorable to Plaintiffs, the Officer Defendants' conduct violated Parminder's Fourth Amendment rights and it was "clearly established" that such conduct constituted a Fourth Amendment violation at the time of the Officer Defendants deadly

encounter with Parminder.  *See Tolan*, 134 S. Ct. at 1866.  Therefore, their argument they are entitled to qualified immunity on this claim at the summary judgment stage must be denied.

As described above, a jury could conclude that the Officer Defendants shot to death a man who at most committed a misdemeanor, was not fleeing, had not armed himself with a weapon, was not threatening the Officer Defendants or anyone else, and asked them not to shoot him.  As the Ninth Circuit has observed, "few things in our case law are as clearly established as the principle that an officer may not 'seize an unarmed, nondangerous suspect by shooting him dead' in the absence of 'probable cause to believe that the [fleeing] suspect poses a threat of serious physical harm, either to the officer or to others.'"  *Torres v. City of Madera*, 648 F.3d 1119, 1128 (9th Cir. 2011) (quoting *Garner*, 471 U.S. at 11); *see also Brousseau*, 543 U.S. at 199 (making clear that "of course" *Garner* serves to give a fair warning to an officer that his conduct violates the Fourth Amendment in an "obvious case").  Not only is this precisely what occurred here, but at the summary judgment stage the instant case follows *a fortiori* from *Garner*.  Here, unlike *Garner*, Parminder was neither "escap[ing]" nor was there a basis for believing that Parminder had committed a felony.  *Garner*, 471 U.S. at 3 ("This case requires us to determine the constitutionality of the use of deadly force to prevent the escape of an apparently unarmed suspected felon.").

The most charitable construction of the Officer Defendants' qualified immunity argument suggests that the case law is not settled on whether a police officer may kill a disturbed person attacking him with a knife where the officer responds to what he believes is case of domestic violence.  (ECF No. 164 at 30–34.)  Of course, the Court can no more accept the Officer Defendants' assertion that Parminder was attacking them with a knife because it is reasserted in connection with their qualified immunity argument.  *See Tolan*, 134 S. Ct. at 1866.

The fact Parminder was emotionally or mentally disturbed and the 9-1-1 call reported an incident of domestic violence does not transform this into a scenario where officers were forced to grope for the "outer contours of the Fourth Amendment" without the benefit of a factually similar case.  *Torres*, 648 F.3d at 1128.  They were spared that "murky business," *id.*, by the Ninth Circuit's decision in *Glenn*.  The encounter in *Glenn* began with the "911 dispatcher

inform[ing] the Washington County Sheriff's Department that officers were needed at the Glenn home for a domestic disturbance." *Glenn*, 673 F.3d at 867. The responding officers were informed that the caller's son "was intoxicated[,] emotionally disturbed," suicidal, and armed with a knife. *Id*. at 867, 873.[5] When officers arrived the decedent was in his driveway, "was not in a physical altercation with anyone, nor was he threatening anyone with the pocketknife or in any other way, and no one was trying to get away from him." *Id*. at 867–68, 874. "He was, however, holding the pocketknife to his own neck." *Id*. at 868. The first two officers to encounter decedent yelled commands at decedent with their guns drawn, including "drop the knife or I'm going to kill you." *Id*. Both officers stood no more than twelve feet from decedent while doing this. *Id*. A third officer who had just arrived fired beanbag shotgun rounds at decedent at the request of one of the two already on the scene. *Id*. at 869. When decedent, "appear[ing] surprised, confused, and possibly in pain," attempted to "move away from the beanbag fire toward the alcove between the house and the garage," the first two officers shot eleven shots from their semiautomatic weapons. *Id*. The officers argued they "were justified in resorting to deadly force because [decedent] had begun to move toward the house where his parents were located [and] they reasonably feared that he could have attacked his parents with the knife so they shot [him] to protect his family." *Id*. at 879. Nevertheless, the Ninth Circuit reversed the district court's grant of summary judgment on the constitutionality of the officer's use of force "[b]ecause the disputed facts and inferences could support a verdict" for the plaintiff. *Id*.

In short, *Glenn* made clear that when officers are dealing with a person who may be mentally or emotionally disturbed, who has not committed a serious crime, is not trying to get away from the officers, is not threatening the officers or others, and is not involved in a physical altercation with anyone, those officers are not free to shoot him. *Glenn* further makes clear that this does not change simply because the officers were initially told they were responding to a domestic dispute.

---

[5]      That the decedent in *Glenn* is intoxicated and armed with a knife is happenstance. *See Tolan*, 134 S. Ct. at 1866. Although, it makes clear that even if an account closer to the Officer Defendants' were accepted, the law would be no less settled with respect to this claim.

For the foregoing reasons, the Officer Defendants' motion is DENIED with respect to the First Claim.

### D. Second Claim: Provocation

The Officer Defendants moved for summary judgment on Plaintiffs' Fourth Amendment provocation claim. (ECF No. 164-1 at 35–37.) However, the Court need not address the parties' arguments in connection with this claim in light of the Supreme Court's recent determination that the Ninth Circuit's "provocation rule" is incompatible with the Supreme Court's "excessive force jurisprudence." *Cty. of L.A., Calif. v. Mendez*, No. 16-369, 2017 WL 2322832, at \*6 (U.S. May 30, 2017). In *Mendez*, the Supreme Court unambiguously held that "the Fourth Amendment provides no basis for such a rule." *Id*. at \*3. Therefore, the Second Claim fails as a matter of law, and the Officer Defendants' motion is GRANTED with respect to this claim.

### E. Third Claim: Substantive Due Process – Familial Association

The Officer Defendants argue that summary judgment should be granted on Plaintiffs' Fourteenth Amendment familial claim for three reasons. First, they argue that the more stringent "purpose to harm" standard should be applied. (ECF No. 164-1 at 37–38.) Second, they argue this more stringent standard cannot be met. (ECF No. 164-1 at 38–39.) Third, they argue it was not clearly established their conduct violated the Fourteenth Amendment. (ECF No. 164-1 at 39.) Each must be rejected.

The Ninth Circuit "has recognized that parents have a Fourteenth Amendment liberty interest in the companionship and society of their children." *Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010). "Official conduct that 'shocks the conscience' in depriving parents of that interest is cognizable as a violation of due process." *Id*. "In determining whether excessive force shocks the conscience, the court must first ask 'whether the circumstances are such that actual deliberation [by the officer] is practical.'" *Id*. (quoting *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008)). "Where actual deliberation is practical, then an officer's 'deliberate indifference' may suffice to shock the conscience." *Id*. "On the other hand, where a law enforcement officer makes a snap judgment because of an escalating situation, his conduct may only be found to shock the conscience if he acts with a purpose to harm unrelated to legitimate law enforcement

28

objectives." *Id.*

The Officer Defendants argue the applicability of "purpose to harm" follows from the Ninth Circuit's decision in *Porter*. (ECF No. 164-1 at 38.) They observe that the officers in *Porter* were required to make "repeated split-second decisions" during the course of a "five-minute altercation." (ECF No. 164-1 at 38.) In their view, the instant action is therefore an obvious case because their encounter with Parminder was shorter than the one in *Porter* and theirs left them with only a "second or two" to decide to shoot Parminder. (ECF No. 164-1 at 38.) Thus, there was "no time for deliberation only self-preservation." (ECF No. 164-1 at 38.)

Again, this argument is premised on the Officer Defendants' view that it is undisputed they were in a quickly evolving situation that abruptly culminated with a close range knife attack. Viewing the evidence in the light most favorable to Plaintiffs, a jury could conclude that the Officer Defendants found time to actually deliberate in the period between their departure from the Family Home — which was described by an eyewitness as "nonchalant" (ECF No. 177-3 at 181:19) — and their shooting of a man a jury could conclude was neither dangerous nor currently in flight. Further, a jury could conclude the duration of the encounter was a function of the Officer Defendants' indifference (or worse) towards Parminder's constitutional rights. Consequently, the Court finds that the submitted evidence creates a genuine dispute about which standard of culpability should apply in this case. *See Rose v. Cty. of Sacramento*, 163 F. Supp. 3d 787, 792 (E.D. Cal. 2016).

In any event, viewing the evidence in the light most favorable to the Plaintiffs, a jury could find the more stringent purpose to harm standard satisfied. "The purpose to harm standard is a subjective standard of culpability." *A.D. v. California Highway Patrol*, 712 F.3d 446, 453 (9th Cir. 2013). More specifically, "[i]t is the intent to inflict force *beyond that which is required by a legitimate law enforcement objective* that 'shocks the conscience' and gives rise to liability under § 1983. . . ." *Porter*, 546 F.3d at 1140 (emphasis added). As described in connection with the First Claim, the governmental interest in using force on Parminder was minimal. Nevertheless, the Officer Defendants shot him 14 times. A jury could find the Officer Defendants had such an illegitimate purpose if that jury concludes the Officer Defendants shot a non-

dangerous, non-fleeing, possibly mentally ill, suspected misdemeanant numerous times after that person may have said "don't shoot."

This would present an "obvious" case such that "qualified immunity is inapplicable, even without a case directly on point." *See A.D.*, 712 F.3d at 455 (concluding shooting a person twelve times where the officer who fired the shots ascertained the decedent was unarmed presented such an "obvious" case even where the decedent had just led officers on a high speed chase in a stolen car and had very recently rammed the police car boxing her in). The Officer Defendants' citation to *Hayes v. Cty. of San Diego*, 736 F.3d 1223 (9th Cir. 2013), is not to the contrary. There, "[t]he decision to use deadly force against Hayes was a snap judgment *based on the unexpected appearance of a knife in his hand*." *See id.* at 1230 (emphasis added).

For the foregoing reasons, the Officer Defendants' motion for summary judgment on the Third Claim is DENIED as they have failed to show they are entitled to judgment as a matter of law on this claim.

### F. Fourth Claim: First Amendment – Familial Association

The Ninth Circuit has recognized a First Amendment familial association claim. *Lee v. Cty. of L.A.*, 250 F.3d 668, 685–86 (9th Cir. 2001). However, there appears to be "no Ninth Circuit case setting out specifically the conduct or elements that constitute violation of familial association under the First Amendment." *Schwartz v. Lassen Cty. ex rel. Lassen Cty. Jail*, No. 2:10-CV-03048-MCE, 2013 WL 5375588, at *10 (E.D. Cal. Sept. 24, 2013); *see also Slusher v. City of Napa*, No: C 15-2394 SBA, 2015 WL 8527411, at *7 (N.D. Cal. Dec. 11, 2015) ("The Court notes that there appears to be no controlling case law regarding the legal standard for stating a familial association claim under the First Amendment."). Therefore, the Court is required to answer two preliminary questions before proceeding. First, what is the standard for determining whether a plaintiff has been deprived of her First Amendment familial association right? Second, does the limited guidance provided by Supreme Court and Ninth Circuit precedent regarding the precise contours of this claim prevent it from being "clearly established" for purposes of qualified immunity?

The Court concludes that Plaintiffs' First Amendment rights to familial association are

measured by the same standard as Fourteenth Amendment rights to familial association based on the Ninth Circuit's analysis in *Lee*. There, the Ninth Circuit held: "plaintiffs have adequately alleged that defendants' actions and policies constituted an 'unwarranted interference' with Kerry Sanders's and his mother's right to familial association *under both* the First and Fourteenth Amendments." *Lee*, 250 F.3d at 686 (emphasis added). *Lee* arose "out of the wrongful arrest, extradition [to New York], and incarceration [in New York] of Kerry Sanders, a mentally disabled Los Angeles resident . . . incorrectly identified . . . as [a] fugitive . . . who absconded from a New York state-prison work-release program." *Id*. at 676. The Ninth Circuit identified the pertinent allegations as follows:

> Mary Sanders Lee began searching for her son after his arrest. She contacted the Los Angeles Police Department, unknown employees of which told her that they had no record of, or information concerning, her son, when in fact, they knew or should have known that they had falsely arrested him and caused him to be extradited to New York. From 1993 to 1995, Mrs. Lee repeatedly contacted the Los Angeles Police Department regarding the whereabouts of Kerry Sanders. However, each time she was informed that his whereabouts were unknown. . . . [T]he reckless, intentional and deliberate acts and omissions of defendants . . . were a direct and legal cause of the deprivation of [Plaintiffs'] constitutionally protected right under the First and Fourteenth Amendments to the association, companionship and society of one and other as mother and son.

*Id*. at 685–86. Nothing in this analysis suggests a different standard applies. Nor does it allow for any principled basis for applying one.[6] Indeed, the phrase "unwarranted interference" in *Lee*, 250 F.3d at 686, is drawn from an earlier Ninth Circuit case's analysis of the substantive due process claim asserted by the children of a man killed during a police encounter. *Smith v. City of Fontana*, 818 F.2d 1411, 1418 (9th Cir. 1987).

Having already concluded that a jury could find that the Officer Defendants' conduct

---

[6] The Court has located three unpublished district court opinions in the Ninth Circuit also concluding the same standard applies but analyzes the issue independently. In *Porter v. Osborn*, No. 3:05-cv-00142 JWS, 2007 WL 2774379, at *3 (D. Alaska Sept. 24, 2007), it is frankly unclear whether any of the district court's opinion on this point survived its mysterious treatment by the Ninth Circuit. *See Porter*, 546 F.3d at 1137 (clarifying the standard of culpability for a due process right to familial association claim while never mentioning the First Amendment); *see also Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 232 n.6 (1995) ("Of course the unexplained silences of our decisions lack precedential weight."). *Alberici v. Cty. of Los Angeles*, No. CV 12-10511-JFW (VBKx), 2013 WL 5573045, at *17 (C.D. Cal. Oct. 9, 2013), on the other hand, reached its conclusion relying on *Kinlaw v. Kozak*, No. C 07-00430 SBA (PR), 2010 WL 986925, at *7 (N.D. Cal. Mar. 17, 2010), which did so without analysis.

"shocked the conscience," even under the "purpose to harm" standard, the Court turns to whether the Officer Defendants are entitled to qualified immunity simply because it is unclear which constitutional provisions their conduct would offend. They are not. "When properly applied, [qualified immunity] protects 'all but the plainly incompetent or those who knowingly violate the law.'" *al-Kidd*, 563 U.S. at 743. Thus, "qualified immunity operates 'to ensure that before they are subjected to suit, officers are on notice *their conduct is unlawful*.'" *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (emphasis added). However, qualified immunity does not give an officer who engages in conduct that was patently unconstitutional when committed a get-out-of-liability-free card because there is "some lingering ambiguity" as to which constitutional provision "applies in this precise context," or whether he has managed to violate several constitutional provisions at once. *See Harris v. City of Circleville*, 583 F.3d 356, 367 (6th Cir. 2009) ("[Even if it were unclear whether the Fourth or Fourteenth Amendment governs Harris's excessive force claims, the legal norms underlying those claims were nevertheless clearly established."); *Estate of Booker v. Gomez*, 745 F.3d 405, 428 (10th Cir. 2014) (same); *Miranda-Rivera v. Toledo-Davila*, 813 F.3d 64, 72–73 (1st Cir. 2016) (same); *see also P.B. v. Koch*, 96 F.3d 1298, 1303 n.4 (9th Cir. 1996) ("Regardless of the appropriate [constitutional] 'home' for plaintiffs' right to be free from excessive force, there was a clearly established right to be free from such force in 1990 and 1991. That there is possible uncertainty as to the appropriate test does not immunize Koch's actions from liability.")

The Court now turns briefly to the Officer Defendants' argument that Plaintiffs' claim fails as a matter of law for failing to prove they had an expressive relationship with Parminder.[7] First, the Officer Defendants suggests that the complaint in such a case must contain allegations that, if true, demonstrate an expressive relationship. (ECF No. 164-1 at 39–40.) Second, the Officer Defendants suggests that the First Amendment would not protect Plaintiffs' relationship

---

[7] The Officer Defendants argue in their reply that Sukhwinder's First Amendment claim is duplicative of her Fourteenth Amendment claim and that Decedent's siblings can only bring a First Amendment claim if their rights to "speech, assembly, petition for redress of grievances, and exercise of religion" have been abridged. (ECF No. 187 at 22–23.) The Court will not address arguments presented for the first time in a reply brief. *Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007).

with Parminder if he "mostly kept to himself[,] did not participate in any community groups with his family" and had to take a taxicab home from a mental hospital after an involuntary mental health hospitalization.  (ECF No. 164-1 at 40.)  These arguments are irreconcilable with *Lee* and therefore are rejected.  *Lee* makes clear that with respect to "family relationships" it is presupposed that they come within the First Amendment's protection.  *Lee*, 250 F.3d at 685.  Moreover, the Ninth Circuit specifically identified the allegations that were "sufficient" to state a claim, which the Court has already reproduced in full *supra*.  Nothing in those allegations or the Ninth Circuit's treatment of them suggests the Officer Defendants' arguments have merit.

For the foregoing reasons, the Officer Defendants' motion for summary judgment on the Fourth Claim is DENIED as they have failed to show they are entitled to judgment as a matter of law on this claim.

### G.  Ninth through Twelfth Claims: State Law Claims

The Officer Defendants' motion as it pertains to Plaintiffs' state law claims requires little discussion.  As a preliminary matter, Plaintiffs acknowledge their Eleventh Claim (Negligent Infliction of Emotional Distress) fails as a matter of law.  (ECF No. 177 at 37.)  Consequently, the Officer Defendants' motion is GRANTED with respect to that claim.  With respect to remaining state law claims, the Officer Defendants argue these "state law claims" fall "[l]ike dominoes . . . with the federal claims" due to the similarities between the state and federal standards.  (ECF No. 164-1 at 41.)  Having failed to tip the federal claim "dominoes," the Officer Defendants have failed to show they are entitled to judgement as a matter of law on the remaining state law claims.  Therefore, the Officer Defendants' motion for summary judgment with respect to the Ninth, Tenth and Twelfth Claims is DENIED.

### H.  Punitive Damages

The Officer Defendants argument that Plaintiffs are not entitled to punitive damages as a matter of law is entirely inadequate.  As Plaintiffs correctly observe, the Officer Defendants have not even "indicated whether they are moving for judgment on Plaintiffs' punitive damages [prayer] under federal or state law" or both.  (ECF No. 177 at 43.)  More importantly, in arguing that there is insufficient evidence to support such an award, the Officer Defendants again

presuppose jurors must accept their version of events.  (ECF No. 164-1 at 42.)  They need not.
The Officer Defendants' motion is therefore DENIED on this point.

### V.      ANALYSIS OF THE CITY DEFENDANTS' MOTION

The City Defendants move for summary judgment on the following claims from TAC.
(ECF No. 163.)  The Fifth Claim — failure to enact adequate customs, policies and/or practices in
violation of the Fourteenth Amendment pursuant to Section 1983 — is brought by Sukhwinder,
as successor in interest to Parminder, against the City Defendants.  The Sixth Claim — failure to
supervise and train in violation of the Fourteenth Amendment pursuant to Section 1983 — is
brought by Sukhwinder, as successor in interest to Parminder, against the City Defendants.  The
Seventh Claim — ratification of the Officer Defendants' violation of Parminder's Fourth and
Fourteenth Amendment rights pursuant to Section 1983 — is brought by Sukhwinder, as
successor in interest to Parminder, against the City Defendants.  The Eighth Claim — failure to
reasonably accommodate disability in violation of Title II of the Americans with Disabilities Act
("ADA") — is brought by Sukhwinder, as successor in interest to Parminder, against Lodi and
LPD.  The Ninth Claim — negligence (survival action) under California law — is brought by
Sukhwinder, as successor in interest to Parminder, against Lodi and LPD.  The Tenth Claim —
negligence (wrongful death) under California law — is brought by Sukhwinder, individually,
against Lodi and LPD.  The Eleventh Claim — negligent infliction of emotional distress under
California law — is brought by Sukhwinder, as successor in interest to Parminder, against Lodi
and LPD.  The Twelfth Claim — interference with civil rights under California law — is brought
by Sukhwinder, as successor in interest to Parminder, against Lodi and LPD.

As the City Defendants' arguments build on each other, the Court will discuss them in the
order discussed in their opening beginning with the ADA claim.  The Court will then discuss the
Section 1983 claims followed by the state law claims.  However, the Court will first discuss some
matters that pertain to the motion generally.

### A.  Preliminary Discussion of the City Defendants' Motion

As a preliminary note, the City Defendants have filed for joinder indicating that they
adopt the entirety of the Officer Defendants' statement of undisputed material facts.  (ECF No.

163-6.)  Additionally, the City Defendants filed a supplemental statement containing 39 items they submit are undisputed material facts.  (ECF No. 163-2.)  There are two running disagreements between the parties regarding fundamental points of summary judgment procedure.  As these permeate the briefs, it will be more efficient to resolve them at the outset.

First, the parties disagree whether in connection with a motion for summary judgment the movant must always cite to evidence properly before the district court before the non-movant is forced to come forward with evidence to support her claim.  Ninth Circuit precedent is settled on this point.  "Under the federal [summary judgment] standard a moving defendant may shift the burden of producing evidence to the nonmoving plaintiff merely by 'showing' — that is, pointing out through argument — the absence of evidence to support plaintiff's claim."  *Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 532 (9th Cir. 2000).

However, the subtext of this disagreement also warrants discussion.  "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion . . . ."  *Celotex Corp.*, 477 U.S. at 325.  Furthermore, "[a] moving party without the ultimate burden of persuasion at trial . . . has both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment."  *Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000).  Where the movant seeks to discharge these burdens through argument, it is essential that the movant actually make one.  *See Fairbank*, 212 F.3d at 532.  Not every time an attorney opens his mouth or produces text on a page has he made an argument.  *See Bartell v. JPMorgan Chase Bank, NA*, 607 F. App'x 731, 732 (9th Cir. 2015) ("Conclusory statements, tautologies and a couple of citations don't an argument make.").  Where the movant fails to make an argument, the burden does not shift to the plaintiff to come forward with evidence.  Certainly, it does not fall on the Court to craft the movant's arguments and then insist on a response from the non-movant.  *See Williams v. Eastside Lumberyard & Supply Co.*, 190 F. Supp. 2d 1104, 1114 (S.D. Ill. 2001).  Rather, the movant's burden is simply not met and summary judgment cannot be granted on that issue.  *See Celotex Corp.*, 477 U.S. at 323.

This first disagreement informs the second. Sukhwinder[8] asserts the City Defendants' motion fails because the City Defendants' have improperly supported their supplemental statement of material facts. (*See, e.g.*, ECF No. 178 at 13.) For the reasons just discussed, a movant need not come forward with evidence in order to satisfy its initial burden. Consequently, it does not necessarily follow that the motion must be denied. Nevertheless, a brief discussion of the applicable standard will streamline the Court's analysis of the City Defendants' motion. Each of the 39 items in the supplemental statement of undisputed material facts cites as supporting evidence a paragraph of one of three declarations from the City Defendants' experts. (*See* ECF No. 163-2.) Sukhwinder argues this is necessarily improper. (*See, e.g.*, ECF No. 178 at 10–12.) The City Defendants disagree and argue in their reply that the majority of these proposed facts are expert opinions thus making them distinguishable from the authorities cited by Sukhwinder. (*See* ECF No. 188 at 3–4; *see generally* ECF No. 188-1 (replying to each of Sukhwinder's objections).)

As Sukhwinder correctly observes "[t]he law is clear . . . that an expert report cannot be used to prove the existence of facts set forth therein." *In re Citric Acid Litig.*, 191 F.3d 1090, 1102 (9th Cir. 1999). Likewise, she correctly observes that if a movant wishes to have the contents of a document considered for summary judgment, it must abide by the requirements of Rule 56. *Id.* ("To be considered in a motion for summary judgment, 'documents must be authenticated by and attached to an affidavit that meets the requirements of [Rule 56] and the affiant must be a person through whom the exhibits could be admitted into evidence.").

Consequently, where the City Defendants cite expert declarants, who have no personal knowledge of the events relevant to the encounter between Parminder and the Officer Defendants, for the proposition that these facts occurred, they are improperly supported. *See Doe v. City of San Diego*, 35 F. Supp. 3d 1233, 1236–37 (S.D. Cal. 2014) (explaining that "Plaintiff has improperly supported her statement of facts by citing to the factual statements set forth by her expert witnesses in their reports rather than citing to facts in the record"); *see also Stonefire Grill, Inc. v. FGF Brands, Inc.*, 987 F. Supp. 2d 1023, 1039 (C.D. Cal. 2013) (distinguishing between

---

[8] The City Defendants' motion only relates to claims brought by Sukhwinder.

"expert opinion" and inadmissible factual summaries and noting the expert "lack[ed] personal knowledge for most of the facts in his report and therefore could not testify to them to prove the truth of the matter").  Likewise, the Court "will not simply assume that the experts have accurately quoted or characterized those documents" that the City Defendants have not bothered to offer in accordance with Rule 56.  *See Harris v. Extendicare Homes, Inc.*, 829 F. Supp. 2d 1023, 1027 (W.D. Wash. 2011).  For example, six of the City Defendants' proposed facts begin with the following phrase: "It is recorded in the personnel files of the officers . . . . " (*See, e.g.*, ECF No. 163-2 at ¶ 145.)  This will not do.

The Court need not resolve the question of whether an expert's opinion may be included in a statement of undisputed material facts as it is unnecessary to resolve this motion.  Moreover, the City Defendants' mischaracterization of summaries of historical facts as expert opinion was not helpful.  For example, the City Defendants suggest that it is an expert opinion whether during a "deposition [Parminder's ex-wife] stated that during her marriage . . . [Parminder] . . . threatened to kill her or himself on three separate occasions."  (ECF No. 188-1 at ¶ 161.)  That is remarkable.  More remarkable still is that this was done after Sukhwinder pincited authority drawing the distinction between expert opinion and factual summaries made by experts in the summary judgment context.  Because of this, and the failure in several instances of the City Defendants to meet their burdens on other grounds, it will be more efficient to address whether specific proposed facts are properly supported in the context of discrete arguments relating to specific claims.  Consequently, the Court will not include a separate factual background section with respect to the City Defendants' motion as it is unnecessary to resolve their motion.[9]

One last related point needs to be addressed, the City Defendants' seeming misapprehension of the function of expert testimony in establishing that something is undisputed.  Expert testimony is only admissible if it "will help the trier of fact to understand the evidence or to determine a fact in issue[.]"  Fed. R. Evid. 702(a).  However, helpful expert testimony is not restricted to opinions regarding factual matters that are undisputed.  *See Williams v. Illinois*, 132

---

[9]     The Court found it unnecessary to resolve the Officer Defendants' objections to Plaintiffs' evidence offered in support of their opposition in order to resolve the Officer Defendants' motion.  (ECF No. 188-2.)

S. Ct. 2221, 2228 (2012) (plurality opinion) ("Under settled evidence law, an expert may express an opinion that is based on facts that the expert assumes, but does not know, to be true. It is then up to the party who calls the expert to introduce other evidence establishing the facts assumed by the expert."). In such a case, the expert's opinion is contingent upon a factfinder agreeing with the facts as the expert assumes them. *See Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993) ("When an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict.") So, for example, the assertion that it is undisputed that the encounter between Parminder and the Officer Defendants "quickly became one wherein public safety became primary concern" does not become undisputed because an expert is of that opinion. (*See, e.g.*, ECF No. 188-1 at ¶ 156.)

### B. The Eighth Claim: Title II of the ADA

The City Defendants move for summary judgment on Sukhwinder's claim under Title II of the ADA for four reasons. First, the City Defendants argue that the ADA claim fails because the Officer Defendants acted reasonably under the circumstances. (ECF No. 163-1 at 17–21.) Second, they argue Sukhwinder cannot show the existence of a reasonable accommodation that could have been provided to Parminder. (*See* ECF No. 163-1 at 17.) Third, they argue Sukhwinder cannot show the City Defendants discriminated against Parminder "solely due to his schizophrenia" because there was a "measurable amount of alcohol in his system." (ECF No. 163-1 at 21.) Fourth, they argue Chief Helms is entitled to qualified immunity on this claim. (ECF No. 163-1 at 26.) Each must be rejected.

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Under Ninth Circuit precedent, Title II of the ADA applies to arrests. *Sheehan v. City & Cty. of San Francisco* ("*Sheehan I*"), 743 F.3d 1211, 1232 (9th Cir. 2014), *rev'd in part, cert. dismissed in part sub nom. City & Cty. of San Francisco, Calif. v. Sheehan*

("*Sheehan II*"), 135 S. Ct. 1765 (2015).[10]  The Ninth Circuit recognizes at least two types of Title II claims applicable to arrests:

> "(1) wrongful arrest, where police wrongly arrest someone with a disability because they misperceive the effects of that disability as criminal activity; and (2) reasonable accommodation, where, although police properly investigate and arrest a person with a disability for a crime unrelated to that disability, they fail to reasonably accommodate the person's disability in the course of investigation or arrest, causing the person to suffer greater injury or indignity in that process than other arrestees."

*Id*.  Sukhwinder brings the latter.  (*See* ECF No. 88 at 23–25.)  With such a claim, the Ninth Circuit has explained that "the plaintiff bears the initial burden of producing evidence of the existence of a reasonable accommodation[.]"  *Id*.  Moreover, the Ninth Circuit agreed that in the arrest context, "exigent circumstances inform the reasonableness analysis under the ADA, just as they inform the distinct reasonableness analysis under the Fourth Amendment."  *Id*.

With respect to the City Defendants' first argument, the parties disagree over whether it is "proper" for the Court to apply the "*Graham* factors to the reasonableness of an accommodation under the ADA."  (*Compare* ECF No. 163-1 at 18 *with* ECF No. 178 at 21.)  The Court need not resolve this dispute because, even assuming that the City Defendants are correct that these factors apply, this argument still fails.  The City Defendants argue that "[Sukhwinder] cannot show that the officers acted unreasonably" when their encounter with Parminder is viewed through the lens of the *Graham* factors "given the totality of the circumstances."  (ECF No. 163-1 at 20.)  The Court has denied the Officer Defendants' motion for summary judgment on Plaintiffs' Fourth Amendment claims explaining in detail why a reasonable jury could conclude that the Officer Defendants' actions were not reasonable within the meaning of the Fourth Amendment.  For these same reasons, the City Defendants' first argument also fails.

With respect to the City Defendants' second argument, Sukhwinder has raised a triable issue regarding whether a reasonable accommodation existed citing to evidence properly before this Court.  In short, Sukhwinder argues a jury could conclude that before the Officer Defendants

---

[10]     In *Sheehan II*, "the Supreme Court declined to address whether Title II of the ADA applies to arrests." *Givens v. Cty. of Sacramento*, No. 2:15-cv-0720-JAM-KJN PS, 2016 WL 6599810, at *4 (E.D. Cal. Nov. 7, 2016). Consequently, this Court is "bound by the Ninth Circuit's decision that the ADA applies to arrests." *Id*.

shot Parminder to death they were aware of his mental illness and nevertheless issued him commands with guns drawn and ultimately pointed at him. (*See* ECF No. 178 at 23.) The Court agrees. Additionally, she cites Jason Roof's report to explain why this type of treatment of a mentally ill person can "provoke a violent response," "exacerbate [his] symptoms" and "cause . . . increased anxiety or fear." (ECF No. 178 at 23.)

The City Defendants' "argument" in reply is wholly inadequate.[11] *See Bartell*, 607 F. App'x at 732. In the eleven lines and one footnote they dedicate to analysis in their reply brief, there is no citation to any authority whatsoever. (ECF No. 188 at 5:13–23 & n.3.) The City Defendants suggest the facts relating to the alleged knife attack are undisputed. (ECF No. 188 at 5 n.3.) This has been addressed at length and requires no further discussion. The City Defendants make no attempt to explain why an accommodation short of hectoring a mentally ill suspected misdemeanant at gunpoint would be unreasonable. Nor do they make any effort to challenge Roof. Instead they cite to three "facts" summarizing records of how Parminder has acted on previous occasions, which have not been properly supported. (*See* ECF No. 188-1 at ¶¶ 177–79.) This is coupled with citation to three "facts" regarding *the risk* that Parminder would be violent during his encounter with the Officer Defendants. (*See* ECF No. 188-1 at ¶¶ 175–76, 180.) Even assuming this opinion testimony is ultimately admitted, it fails to show how Parminder *actually* behaved is undisputed. For these reasons, the City Defendants' second argument also fails.

With respect to City Defendants' third argument, they have neither demonstrated that Parminder was drinking alcohol prior to his encounter with the Officer Defendants nor that this is the only inference that can be drawn from the facts properly before the Court. Even where movant supports its position with a fact, "summary judgment is inappropriate when different

---

[11] The Court discusses this "argument" out of completeness, even though arguably it was not pressed until the reply brief. In its discussion under the heading "The ADA Claim Fails Because the Officers Acted Reasonably" the City Defendants mention in passing a "plaintiff bears the initial burden of producing evidence of the existence of a reasonable accommodation." (ECF No. 163-1 at 17.) Nearly four pages later the City Defendants state "Plaintiff's arguments that the officers should have acted differently to mitigate the risk do not save this argument in the absence of any evidence." (ECF 163-1 at 20.) It is not even clear what "this argument" refers to. Nevertheless, in their reply, the City Defendants' primary focus with respect to the ADA is that Plaintiff's "opposition shows that Plaintiff cannot meet this burden." (ECF 188 at 5.)

ultimate inferences may be drawn from the evidence." *Cushman v. City of Troutdale*, No. Civil No. 07-0012-HU, 2009 WL 890505, at *2 (D. Or. Mar. 30, 2009) (citing *Sankovich v. Ins. Co. of N. Am.*, 638 F.2d 136, 140 (9th Cir. 1981)).

The assertions that Parminder was drinking, was intoxicated, and that intoxication had an impact on his encounter with the Officer Defendants is premised on a single undisputed fact — a toxicology test conducted four days after the shooting showed there was a "measurable amount of alcohol" in Parminder's corpse. (*See* ECF No. 178 at 23–25.) The focus of Sukhwinder's opposition is that the City Defendants have offered "pure speculation" supported by "no evidence" that the presence of alcohol in a corpse under these circumstances must result from drinking alcohol, let alone to the point of intoxication. (ECF No. 178 at 23–24.) Mysteriously, the City Defendants have not bothered to respond to this point in their reply brief.[12] In any event, it is noteworthy the paragraph cited by the City Defendants in their opening brief, and Sukhwinder in opposition, does not state that Parminder was drinking nor does evidence cited in support of it say that he was. (ECF No. 164-2 at ¶ 125.)[13] Indeed, one of the paragraphs in the toxicologist's declaration cited as support notes that bodily decomposition may have caused discrepancies in his measurements of alcohol in Parminder's corpse.[14] (ECF No. 164-8 at ¶ 8.) Simply put, the City Defendants have failed to show why the inference *they would draw* is the only inference that could be drawn by a jury.

---

[12]     The City Defendants are reminded that it is their burden to demonstrate that they are entitled to judgment as a matter of law. When a non-moving party's opposition seriously calls into question whether the movant is entitled to summary judgment on a particular ground, it is not role of the Court to fill the awkward silence in the movant's reply brief. *See Williams*, 190 F. Supp. 2d at 1114.

[13]     It is also noteworthy that in connection with the Officer Defendants' motion, Plaintiffs disputed the Officer Defendants' proposed undisputed fact that Parminder had been drinking by pointing out that none of the evidence cited stated Parminder had been drinking. (ECF No. 177-1 at ¶ 1.) This is accurate. Inferences that a party would have drawn from a fact are not properly included in a statement of undisputed facts.

[14]     Strangely, the City Defendants have tucked into a thirty-one page document called "Municipal Defendants' Reply to Plaintiffs' Response to Separate Statement of Undisputed Material Facts in Support of their Motion for Summary Adjudication" a one sentence statement that "[t]here is no evidence the blood continued to metabolize post-mortem" and that such a suggestion is "nonsensical." (ECF No. 188-1 at ¶ 172.) The parties are reminded the Court has no obligation to scour their filings in the hopes of finding an argument not included in their briefs. *Williams*, 190 F. Supp. 2d at 1114 ("A judge is . . . neither required to hunt down arguments plaintiffs keep camouflaged nor required to address perfunctory and undeveloped arguments.") In any event, this "argument" ignores the above-cited portion of Defendants' own submissions.

As to the fourth argument, a qualified immunity defense is unavailable to Chief Helms in connection with Sukhwinder's claim under Title II of the ADA for two separate reasons. First, as Sukhwinder correctly observes, she has not brought this claim against Chief Helms in the first place. (*See* ECF No. 88 at 23–25.) Second, "[i]ndividual liability is precluded under ADA Title II." *Roundtree v. Adams*, No. 1:01-cv-06502–OWW-JLO, 2005 WL 3284405, at *8 (E.D. Cal. Dec. 1, 2005). Consequently, qualified immunity is simply inapplicable to violations of Title II of the ADA. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

For the foregoing reasons, the City Defendants' motion for summary judgment on the Seventh Claim is DENIED.

## C. Section 1983 Claims Against the City Defendants

The Fifth, Sixth, and Seventh Claims are each brought pursuant to Section 1983. Before discussing them individually, the Court will briefly set out the standard for municipal liability under said section. The Court will also briefly deal with one of City Defendants' arguments common to the Fifth and Sixth Claims.

"In *Monell*, the Supreme Court held that municipalities are 'persons' subject to damages liability under section 1983 where 'action pursuant to official municipal policy of some nature cause[s] a constitutional tort.'" *Gillette v. Delmore*, 979 F.2d 1342, 1346 (9th Cir. 1992) (quoting *Monell v. Department of Social Servs.*, 436 U.S. 658, 691 (1978)). "The Court made clear that the municipality itself must cause the constitutional deprivation and that a city may not be held vicariously liable for the unconstitutional acts of its employees under the theory of *respondeat superior*." *Id.* Consequently, a plaintiff seeking to establish municipal liability must demonstrate a municipality had a "deliberate policy, custom, or practice that was the 'moving force' behind the constitutional violation he suffered." *Galen v. Cty. of Los Angeles*, 477 F.3d 652, 667 (9th Cir. 2007). A plaintiff may establish municipal liability under section 1983 in the following three ways:

> "First, the plaintiff may prove that a city employee committed the alleged constitutional violation pursuant to a formal governmental policy or a longstanding practice or custom which constitutes the standard operating procedure of the local governmental entity. Second, the plaintiff may establish that the individual who

42

committed the constitutional tort was an official with final policy-making authority and that the challenged action itself thus constituted an act of official governmental policy. Whether a particular official has final policy-making authority is a question of state law. Third, the plaintiff may prove that an official with final policy-making authority ratified a subordinate's unconstitutional decision or action and the basis for it.

*Id*. at 1346–47 (internal citations and quotation marks omitted).

The City Defendants argue that "because Plaintiff's failure to accommodate claims fails" her "*Monell* claims alleged in the Fifth and Sixth cause of action" must fail also as they are "based on contacts with mentally ill persons." (ECF No. 163-1 at 22.) The Court would first observe that the City Defendants have cited no authority for this proposition. In any event, this argument fails because the Court has denied the City Defendants' motion on the Seventh Claim.

D. <u>The Fifth Claim: Failure to Enact Adequate Customs, Policies or Practices</u>

The City Defendants argue they are entitled to summary judgment on Sukhwinder's Fifth Claim for two reasons. Each must be rejected. First, the City Defendants assert that "[a]t the summary judgment stage, [Sukhwinder] must show with evidence that there is a *'proper way'* to *interact with [Parminder]*, that the officers failed to do so, and that this was the moving force behind the violation" in order to make out this claim. (ECF No. 163-1 at 22 (emphasis added).) The City Defendants neither cite authority nor offer legal analysis in support of this proposition. This seems to have been an attempt by the City Defendants to discharge their initial burden through argument. They have not met this burden, as this sentence does not "an argument make."[15] *See Bartell*, 607 F. App'x at 732.

Second, the City Defendants argue that "[b]ecause Officers Bratton and Lockie appropriately dealt with the situation as presented to them, [Sukhwinder] cannot show any deliberate indifference on behalf of [LPD], and this claim should be dismissed." (ECF No. 163-1 at 23.) The Court will not tarry long over this "argument." The Court has already concluded that

---

[15] The reply repeats that the City Defendants are generally of the view that there can be no *Monell* liability under Section 1983 unless there is liability under Title II of the ADA. (ECF No. 188 at 6 ("Plaintiff's opposition puts the cart before the horse first arguing *Monell* liability then moving onto the ADA claim.") Characteristically, no authority is cited for this proposition. The Court's best guess is the sentence at issue was an ineffectual attempt to argue the Court should engraft on Section 1983 claims the initial burden placed on a plaintiff in a reasonable accommodation claim under Title II of the ADA. Putting aside that the City Defendants have offered no authority for this proposition, the Court has already found this burden satisfied in connection with Sukhwinder's ADA claim.

43

a reasonable jury could find that the Officer Defendants' actions during their encounter with Parminder were objectively unreasonable and shocked the conscience, even applying the more stringent purpose to harm standard. Although Sukhwinder finds fault with each of the items cited in support of this "argument," these items do not warrant detailed discussion. Suffice to it say, the City Defendants' operative discussion of the encounter between Parminder and the Officer Defendants begins with the assertion that it "quickly became one wherein public safety became primary concern" citing their expert. (*See* ECF No. 163-1 at 23.) A jury need not adopt wholesale the Officer Defendants' version of events simply because the City Defendants' expert does. *See Brooke Grp. Ltd.*, 509 U.S. at 242.

For the foregoing reasons, the City Defendants' motion for summary judgment on the Fifth Claim is DENIED.

E. <u>The Sixth Claim: Failure to Supervise and Train</u>

The City Defendants have offered two general arguments in favor of their motion for summary judgment on this claim. Each fails. The Court will discuss these first. A discussion of Defendant Helms's separate, third argument relating to liability in his individual capacity follows.

The City Defendants begin their analysis with a citation to *Connick v. Thompson*, 131 S. Ct. 1350, 1360 (2011), for the proposition that "[i]n considering claims based on a failure to train municipal employees, a pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference." (ECF No. 163-1 at 23 (internal quotation marks omitted).) This is followed by the assertion that "[Sukhwinder] cannot meet this burden." (ECF No. 163-1 at 23.) As Sukhwinder correctly observes, "the Supreme Court, in *Connick*, recently affirmed the validity of the so-called 'single-incident' theory" of liability. *Schwartz v. Lassen Cty. ex rel. Lassen Cty. Jail (Det. Facility)*, 838 F. Supp. 2d 1045, 1058 (E.D. Cal. 2012). "*Connick* explained that the 'single-incident' theory represents the Supreme Court's refusal to 'foreclose upon the possibility' that the failure to train is so patently obvious that a single constitutional violation suffices to give rise to municipal liability under § 1983." *Id*. The opposition cites four district court opinions from within the Ninth Circuit, including one from this Court, where single-incident theory claims survived motions for summary judgment. (ECF No.

44

178 at 17–18.)  Each opinion involved alleged applications of excessive force on mentally ill persons.  (ECF No. 178 at 17–18.)  This was met with silence in the reply brief.  It is not the role of the Court to fill this silence.  The City Defendants have not met their burden to demonstrate they are entitled to judgment as a matter of law on this point.

What the Court construes as an attempt at a second "argument" is wholly inadequate.  For example, in two sentences copied and pasted from their supplemental statement of undisputed material facts, the City Defendants assert LPD officers receive training that is required by the State of California and the California Commission on Peace Officer Standards and Training. (ECF No. 163-1 at 24.)  While Sukhwinder correctly observes the City Defendants have not properly submitted the records their expert is interpreting, there is a more serious problem.  (ECF No. 178 at 18.)  The City Defendants have made no argument why this entitles them to judgment as a matter of law on this federal constitutional claim.  The final paragraph suffers from precisely the same problems.  The City Defendants again have not met their burden.

Defendant Helms moves for summary judgment on Plaintiff's Sixth Claim, arguing that "[e]ven assuming the Lodi Police Department failed to adequately train its officers, there is no evidence" of Defendant Helm's personal involvement.  (ECF No 163-1 at 25.)  Sukhwinder's opposition comes forward with no evidence in response.  (ECF No. 178 at 12–13.)  Consequently, summary judgment must be granted in favor of Defendant Helms on this claim.

As previously discussed, Sukhwinder's suggestion that Defendant Helms did not meet his initial burden is incorrect.  (*See* ECF No. 178 at 12.)  As Defendant Helms correctly observed, it is an essential element of a Section 1983 claim seeking damages against a government official that the government official be shown to have violated the constitution by his own actions.  *Starr v. Baca*, 652 F.3d 1202, 1205–06 (9th Cir. 2011).  It is well-settled that "§ 1983 suits do not allow for the imposition of vicarious liability[.]"  *Id*. at 1206.  This is so even with supervisors, although they need not be "physically present" or be "directly and personally involved in the same way as are the individual officers who are on the scene inflicting constitutional injury."  *Id*. at 1205–06. Consequently, for this claim, we are now at the critical "moment in [the] lawsuit, when the nonmoving party must show what evidence it has that would convince a trier of fact to accept its

45

version of events." *Mendelson v. Country Coach, Inc.*, No. EDCV 06-00572-SGL (OPx), 2007 WL 4811927, at *2 n.1 (C.D. Cal. Nov. 19, 2007); *see also Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996) ("We rely on the nonmoving party to identify with reasonable particularity the evidence that precludes summary judgment.").  None has been cited in the opposition for this claim.

The opposition seeks to excuse this by arguing that "the actions and inactions of Defendant Helms *necessarily encompass those of municipal Defendants City and LPD*, for whom he was a policy-maker." (ECF No. 178 at 12 (emphasis added).)  This is incorrect.  The cases cited in the opposition do not support this argument.  The source of the opposition's confusion seems to be the use of "supervisory liability" in some opinions dealing with § 1983 suits or *Bivens* actions and the non-existence of vicarious liability for such claims.  This was clarified in *Iqbal*. *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009) ("In a § 1983 suit or a *Bivens* action — where masters do not answer for the torts of their servants — the term 'supervisory liability' is a misnomer.")  It is evident from *Iqbal* — where the plaintiff sued the United States Attorney General and FBI Director — that vicarious liability is no more available for a Section 1983 claim because a plaintiff sues a high-ranking official or one with policymaking authority.  *Id.*

For the foregoing reasons, the City Defendants' motion for summary judgment on the Sixth Claim is GRANTED as to Defendant Helms, in his individual capacity.  Otherwise, it is DENIED.

## F.  The Seventh Claim: Ratification

The City Defendants move for summary judgment on Sukhwinder's ratification claim arguing that she cannot show that Defendant Helms's actions amounted to the approval by a municipal policymaker of "both the [unconstitutional] action and the illicit basis for it."  (ECF No. 163-1 at 24.)  Although the opposition incorrectly suggests it need not offer any evidence in support of its claim, it nonetheless submits its theory citing evidence: "[the] City Defendants' ratification of [the] Officer Defendants' action in this case was, essentially, a gratuitous media campaign professing justification in the face of conflicting eye-witness testimony."  (ECF No. 178 at 20.)  In short, the opposition suggests that Defendant Helms should not have accepted the

46

Officer Defendants' version of events and may not have if he had conducted a better investigation, e.g., personally interviewing the Officer Defendants. (ECF No. 178 at 20–21.) This argument fails as a matter of law.

Ninth Circuit precedent makes clear that the ratification theory "requires that a policymaker approve a subordinate's decision *and the basis for it* before the policymaker will be deemed to have ratified the subordinate's discretionary decision." *Gillette*, 979 F.2d at 1348 (emphasis retained). The policymaker must make a "conscious, affirmative choice to approve [the subordinate's] actions and adopt them as official policy." *Clouthier v. Cty. of Contra Costa*, 591 F.3d 1232, 1253 (9th Cir. 2010). That is, the policymaker must approve of the *improper* basis for the decision. *Ellins v. City of Sierra Madre*, 710 F.3d 1049, 1067 (9th Cir. 2013); *see also Clouthier*, 591 F.3d at 1253 (*"*As we stated in *Gillette*, '[t]o hold cities liable under section 1983 whenever policymakers fail to overrule the unconstitutional discretionary acts of subordinates would simply smuggle *respondeat superior* liability into section 1983 law [creating an] end run around *Monell*.").

This is clearly demonstrated by the Ninth Circuit's analysis in *Ellins*. There, the plaintiff alleged that the chief of police delayed signing an application for a certification that would entitle him to a five percent raise as retaliation for exercising his First Amendment rights. *Ellins*, 710 F.3d at 1053. The city manager had final policymaking authority over police employment decisions and it was "undisputed that [the city manager] approved [of the police chief's] decision to delay signing [plaintiff's] application." *Id*. at 1066. Nevertheless, the Ninth Circuit affirmed the district court's grant of summary judgment because the plaintiff did "not allege that [the city manager] *knew* that the decision was in retaliation for protected speech or that she *ratified the decision despite such knowledge*." *Id*. (emphasis added).

The opposition suggests that a municipal policymaker must accept a plaintiff's version of events surrounding an allegation of unconstitutional behavior by that policymaker's subordinate until that plaintiff's version is conclusively disproven in order to avoid inadvertently ratifying the subordinate's possibly unconstitutional behavior. This is not the law. *See Gainor v. Douglas Cty., Georgia*, 59 F. Supp. 2d 1259, 1293 n.41 (N.D. Ga. 1998); *see also Kanae v. Hodson*, 294

F. Supp. 2d 1179, 1191 (D. Haw. 2003) ("The law does not say that, whenever an investigative group accepts an officer's version over a victim's differing version, this acceptance establishes a policy for which a municipality may be held liable under § 1983.  If that were the law, counties might as well never conduct internal investigations and might as well always admit liability.  But that is not the law.")

Perhaps more importantly, the opposition's argument "fails for lack of causation." *Long v. City & Cty. of Honolulu*, 378 F. Supp. 2d 1241, 1248 (D. Haw. 2005) ("Even if the after-the-fact internal investigation here was somehow a 'coverup' (and there is no such evidence), it would not have prevented the shooting of Long."), *aff'd*, 511 F.3d 901 (9th Cir. 2007).  A single "inadequate investigation following the subject incident will not sustain a claim of municipal liability, because the after-the-fact inadequate investigation could not have been the legal cause of the plaintiff's injury." *Feliciano v. City of Miami Beach*, 847 F. Supp. 2d 1359, 1367 (S.D. Fla. 2012); *see also, e.g.*, *Haugen v. Brosseau*, 339 F.3d 857, 875 (9th Cir. 2003) ("Haugen cannot, of course, argue that the municipality's later action (or inaction) caused the earlier shooting."); *Mettler v. Whitledge*, 165 F.3d 1197, 1205 (8th Cir. 1999) ("However, even if we are to assume as true that there were shortcomings in the investigation into the January 22 shooting, the shortcomings would not prove the flawed investigation was a moving force behind the deputies' alleged misconduct.").[16]  The same is true where the plaintiff seeks to impose liability on a policymaker in his individual capacity on a ratification theory.  *See, e.g.*, *Peschel v. City of Missoula*, 686 F. Supp. 2d 1092, 1103–05 (D. Mont. 2009); *see also Jones v. Cty. of Sacramento*, No. Civ. 2:09-1025 WBS DAD, 2010 WL 2843409, at *7 (E.D. Cal. July 20, 2010) ("[A] supervisor's isolated and subsequent ratification of an officer's conduct . . . can never be sufficient to show that the supervisor caused the officer's conduct.").

For the foregoing reasons, the City Defendants' motion for summary judgment on the Seventh Claim is GRANTED.

---

[16]     Of course "[e]vidence that a police department has failed to investigate previous incidents similar to the incident in question may support a finding that a municipal custom exists, and that such a custom encourages or allows officers to use excessive force without concern for punishment." *Mettler*, 165 F.3d at 1205.  Plaintiffs have neither made such an argument nor cited any such evidence.

G. <u>Ninth through Twelfth Claims: State Law Claims</u>

The City Defendants "join" the Officer Defendants' motion with respect to the state law claims and provide no additional analysis. (ECF No. 163-1 at 26.) The outcome is the same. The motion is GRANTED with respect to the Eleventh Claim. It is DENIED with respect to the Ninth, Tenth and Twelfth Claims.

**VI.    CONCLUSION**

For the foregoing reasons, the Officer Defendants' motion is GRANTED in part and DENIED in part. It is GRANTED with respect to: (i) the Second Claim and (ii) the Eleventh Claim. Otherwise, it is DENIED.

For the foregoing reasons, the City Defendants' motion is GRANTED in part and DENIED in part. It is GRANTED with respect to: (i) the Sixth Claim, as it applies to Chief Helms in his individual capacity, (ii) the Seventh Claim, and (iii) the Eleventh Claim. Otherwise, the City Defendants' motion is DENIED.

IT IS SO ORDERED.

Dated: June 29, 2017

Troy L. Nunley
United States District Judge